IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL  DIVISION

| | |
|---|---|
| MICHAEL HAVILAND, JAMIE AIKEN, and JEREMY PATCHIN,<br><br>    Plaintiffs,<br><br>    v.<br><br>CATHOLIC HEALTH INITIATIVES–IOWA, CORP.,<br><br>    Defendant. | 4:07-cv-018<br><br><br><br><br>ORDER |

Before the Court is a Motion for Summary Judgment, filed November 30, 2009 by

Catholic Health Initiatives–Iowa, Corp. (hereinafter "Defendant" or "Mercy").  Clerk's No. 90.

Michael Haviland ("Haviland"), Jamie Aiken ("Aiken"), and Jeremy Patchin ("Patchin")

(collectively "Plaintiffs") filed a resistance on March 25, 2010.  Clerk's No. 129.  Mercy filed a

reply on April 8, 2010.  Clerk's No. 141.  The matter is fully submitted.

## I.   PROCEDURAL HISTORY

Haviland, individually and on behalf of all other similarly situated employees, filed a

petition in the Iowa District Court for Polk County on December 20, 2006, alleging that

Defendant violated the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq.

(the "FLSA"), and the Iowa Wage Payment Collection Act, Iowa Code Chapter 91A et seq.

("IWPCA").  *See* Clerk's No. 1-1.  On January 9, 2007, Defendant removed the case to federal

court, pursuant 28 U.S.C. § 1331.  *See* Clerk's No. 1.  Subsequently, Haviland filed an Amended

Complaint wherein Aiken and Patchin were added as named representative Plaintiffs.  *See*

Clerk's No. 40.

In their Amended Complaint, Plaintiffs, current and former private security officers ("PSOs") for Mercy, state that they perform various security duties for three separate Mercy hospital locations, Mercy Main, Mercy Capitol,[1] and Mercy Franklin.  Am. Compl. ¶ 18. Plaintiffs' regular duties at the various locations "include monitoring facilities, responding to emergencies, and patrolling the building surrounding the hospital."  *Id.* ¶ 17.   While Plaintiffs are supposed to receive an unpaid thirty-minute meal break on each shift, the Amended Complaint alleges that, "[w]hen Plaintiffs are scheduled to work at either Mercy Capitol or Mercy Franklin, they do not receive a mealtime break."  *Id.* ¶ 19.   More specifically, Plaintiffs contend that, though they are permitted to eat at both Mercy Capitol and Mercy Franklin, the restrictions on their freedom are such that they are, in actuality, continuing to work throughout their thirty-minute lunch breaks.  *Id.* ¶¶ 20-25.   Accordingly, Plaintiffs request that Mercy be required to pay them "the amount respectively due them for overtime compensation and interest, liquidated damages, and costs," along with reasonable attorneys fees, under both the FLSA and the IWPCA. *Id.* at 4-5.

On April 10, 2007, Plaintiffs requested class action certification under Federal Rule of Civil Procedure 23 for their IWPCA claim, and collective action certification under § 216(b) for their FLSA claim.  Clerk's No. 18.   In an Order dated October 19, 2007, the Court denied class certification for the IWPCA claim on the basis that the commonality and typicality requirements of Rule 23(a)(2)-(3) were not satisfied.  Clerk's No. 49 at 9-11.   The Court, however, granted conditional collective certification of the FLSA action.  Clerk's No. 49.   Although forty-four

---

[1] As noted *infra*, at some point in 2009, Mercy Capitol closed and security services were thereafter rendered at a new facility known as Mercy West Lakes.

potential collective members were initially identified, only nine ultimately opted to participate in the collective action.[2]  *See* Clerk's Nos. 40, 56-59.

## II.  FACTS

Mercy staffs its three locations, Mercy Main, Mercy Franklin, and Mercy Capitol, with public safety officers twenty-four hours per day.  Pls.' Statement of Disputed Facts (hereinafter "Pls.' Facts") ¶ 7.[3]  At some point in 2009, Mercy Capitol closed, but Defendant opened another

---

[2] In addition to the named representative Plaintiffs, six other individuals opted into the FLSA collective:  Charlie Dixson, George Williamson, William Mortensen, Brian Sanger, David Hauser, and Chad Maas.  *See* Clerk's Nos. 56-59.

[3] In replying to Plaintiffs' Resistance, Defendant failed to file a response to Plaintiffs' Statement of Disputed Facts (Clerk's No. 123.3).  Local Rule 56(d) provides:

> The moving party must, within 7 days after service of the resisting party's statement of additional facts, file a reply in which the moving party expressly admits, denies, or qualifies each of the resisting party's numbered statements of additional fact.  A reply to an individual statement of additional material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the moving party's refusal to admit the statement, with citations to the appendix containing that part of the record.  The failure to reply, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact.

The Court, in its factual recitation, has accepted many of Plaintiffs' asserted facts as true, in accordance with the Local Rule.  The Court, however, declines to accept *all* of Plaintiffs' asserted facts as true for at least two reasons.  First, despite failing to specifically resist Plaintiffs' factual assertions, Defendant has nonetheless refuted many of Plaintiffs' asserted facts by way of its own Statement of Facts, its Brief in Support of Summary Judgment, and its Reply Brief.  Second, many of Plaintiffs' asserted facts are not actually "facts," as that term is envisioned by Federal Rule of Civil Procedure 56.  Instead, many of Plaintiffs' "facts" are actually legal arguments, while others seek to draw inferences that are either not supported by the corresponding citations or are ultimate legal conclusions at issue in the present dispute.  *See*, *e.g.*, Pls.' Facts ¶ 101 ("Defendant has not disciplined any employee for engaging in these time killing activities and therefore did not believe that these activities interfered with the performance of their job duties."); ¶ 104 ("Mercy seeks to obtain a free half hour from each employee by automatically deducting time from their paycheck. . . ."); ¶ 106 ("Defendant has permitted employees to sleep on the job indicating that a primary job

facility known as Mercy West Lakes, which also staffs a PSO twenty-four hours per day.  *Id.* ¶ 8.

At any given time, Mercy Main staffs a dispatcher and three PSOs per shift.  *Id.* ¶¶ 13-14.

According to Plaintiffs, this staffing arrangement generally makes it possible for PSOs working

at the Mercy Main campus to leave work or take a meal period knowing that their job duties

would be covered by another officer.  *Id.* ¶ 18.  Mercy Capitol, Mercy Franklin, and Mercy West

Lakes, however, are (or were) each staffed by only one PSO per shift.[4]  *Id.* ¶¶ 15-17.

Plaintiffs are all PSOs employed by Defendant for various time periods from December

20, 2003 through the present day.[5]  *Id.* ¶ 1.  Plaintiffs contend that Defendant "employed [PSOs]

and contracted with them to perform scheduled tasks," which Plaintiffs identify as:  "engage to

wait to perform scheduled tasks, engage to respond to incidents, engage to wait to respond to

incidents, monitor; and employ them to be a presence in the physical locations at the ready to

_____

function is the mere presence of an officer in the building.").

[4]  Plaintiffs admit, however, that during two unspecified years of Patchin's employment with
Mercy, he was scheduled with a second officer at the Mercy Capitol facility.  Pls.' Facts ¶ 20.

[5]  Haviland was employed from January 29, 2001 to November 27, 2007, and worked primarily
at Mercy Franklin on the third shift.  Pls.' Facts ¶¶ 22-23.  Aiken was employed from October
25, 2004 through the present, and has worked at all four facilities on the second shift.  *Id.* ¶¶ 24-
25.  Patchin was employed from May 22, 2001 to January 6, 2007, and worked at Mercy Main,
Mercy Capitol, and Mercy Franklin on the first shift.  *Id.* ¶¶ 26-27.  Charlie Dixson was
employed from April 7, 2002 to December 30, 2009, and worked second shift at all four
locations.  *Id.* ¶¶ 28-29.  David Hauser was employed from May 27, 2004 to December 2007,
and worked at Mercy Main, Mercy Capitol, and Mercy Franklin on the second shift.  *Id.* ¶¶ 30-
31.  Chad Maas was employed from November 17, 2003 to July 4, 2007, and worked at Mercy
Main, Mercy Franklin, and Mercy Capitol on the third shift.  *Id.* ¶¶ 32-33.  William Mortensen
was employed from April 5, 2005 to July 2008, and worked at Mercy Main, Mercy Capitol, and
Mercy Franklin on the third shift.  *Id.* ¶¶ 34-35.  Brian Sanger was employed from September 12,
2004 to September 8, 2006, and worked at Mercy Main, Mercy Capitol, and Mercy Franklin on
the second shift.  *Id.* ¶¶ 36-37.  George Williamson was employed from January 28, 2000 to
September 12, 2007, and worked at Mercy Main, Mercy Capitol and Mercy Franklin on the third
shift.  *Id.* ¶¶ 38-39.

respond to incidents and otherwise act as a deterrent to ensure public safety." *Id.* ¶ 2.  The

evidence in this case makes clear, however, that Plaintiffs had significant amounts of free time to

engage in various personal pursuits during their shifts working as PSOs for Mercy.  *See* Def.'s

Statement of Undisputed Facts (hereinafter "Def.'s Facts") ¶ 13; Pls.' Facts ¶ 93.  Haviland, for

instance, testified in his deposition that, while on duty as a PSO, he has gone to lunch with other

officers, eaten in the cafeteria, had food delivered, brought food from home, left Mercy's

premises to get a snack or to smoke, studied and typed reports, surfed the internet, sent and

received personal email, watched movies on the internet, played on-line games, played cards,

and read books and newspapers.  Def.'s App. at 16, 18, 19, 23, 30.  Likewise, while on duty,

Patchin admits that he went to the hospital cafeteria, had food delivered, brought food from

home, accessed pornographic or adult-content web sites, watched DVDs or movies, played

cards, left Mercy's premises "daily" to go to Quik Trip to smoke and buy a soda, played chess,

and accessed the internet for personal use anywhere from one-half hour to two hours per day on

a typical shift.  *Id.* at 30-34.  Aiken also reports that he has used time during his shifts to eat,

have food delivered, study, use the internet, go to Quik Trip, play online games, look at

pornographic materials, read magazines and books, make phone calls, study, check personal

email, and surf the internet.  *Id.* at 3-7.  Video surveillance and Plaintiffs' internet logs confirm

that Plaintiffs engaged in various personal pursuits while on duty.[6]  *See id.* at 43-196 (log of

Aiken's on-duty internet usage for November 2006); 197-479 (log of Haviland's on-duty internet

---

[6]  Plaintiffs point out that Defendant "did not have to allow public safety officers access to the
internet because Defendant has an *intranet* system for employees for company emails or
notifications."  Pls.' Facts ¶ 5.  Plaintiff further points out that the only PSO ever formally
disciplined for misusing the internet was an individual who placed a pornographic picture on
another officer's computer.  *Id.* ¶ 6.

usage for March 2007); 480-565 (log of Patchin's on-duty internet usage for July 2006); 566-71

(video surveillance stills showing Haviland eating, reading the newspaper, and balancing his

checkbook).

PSOs are scheduled to work for eight and one-half hour shifts, but are only paid for eight

hours.  Pls.' Facts ¶ 10.  The remaining half-hour is automatically deducted from the calculation

of an employee's hours worked, and is intended to be a non-working, unpaid meal period.  *Id*. ¶

11.  Mercy has two written policies that refer to meal periods or lunches.  First, Mercy's general

corporate policy provides:

> A.  Employees who are scheduled to work 8 or more hours should receive one 30-minute unpaid meal period whenever possible.
> B.  Employees working shifts that are less than 8 hours can take a meal break if scheduled to do so.  The 30-minute meal break is without pay.
> C.  When an employee is unable to take a 30-minute meal break without disruptions caused by work, or if the meal break is disrupted by work responsibilities, the supervisor must be notified and notation of no meal will be made at the time clock at the end of shift.  This time will count as worked hours.
> D.  If an employee is unable to take a meal period due to work responsibilities, an employee may not choose to leave work one-half hour early.  The supervisor, however, may authorize the employee to do this if work volumes are sufficiently covered.  This practice is not encouraged as a solution for missed meal breaks.
> E.  Employees may leave the hospital premises during meal periods.  Non-exempt employees must punch out/in when leaving and returning to work.
> F.  If the employee exceeds the 30 minute limit or fails to punch out and/or in on the time clock, he/she may be subject to disciplinary action.
> G.  An employee that is leaving the hospital premises for a meal, and is required to wear hospital provided scrubs, must change from and to scrub attire within the 30-minute meal period.

*Id*. ¶ 64; Def.'s App. at 1.  A more specific policy, directly applicable to Mercy's PSOs, is entitled,

"Security/Safety Department Policy" on "Overtime Authorization[s]," and states:

> To provide the Security Director with a means of monitoring and managing the

Overtime Program, and to insure accountability the following procedures are to be used when it becomes necessary for Security Personnel to work overtime.

It is the policy of the Security Department to avoid situations that make overtime necessary, at the same time recognizing that at times, overtime is unavoidable. Through proper scheduling and planning of staff use of paid time off, most overtime situations can be avoided.  This includes the approval of short notice vacations, or any P.T.O. requests that will lower staffing levels below the minimum of three officers per shift.
. . .
Each employee is responsible for making an effort to take a lunch break.  If it appears that there will be insufficient time to break for lunch, the employee should arrangement [sic] for relief.  The Shift Supervisor may then elect to provide relief, allow the employee to leave work and clock-out 30 minutes prior to the shift's end, or authorize overtime.

The hospital has a cafeteria and vending area which provides refreshments. Employees may also bring food if they like.  Therefore inability to get to the cafeteria does not constitute a missed lunch break.

Pls.' Facts ¶ 65; Def.'s App. at 40-41.  On November 21, 2006, Mercy's PSOs were reminded of

Mercy's meal period policy in an email sent by Tony Biancalana:

A friendly reminder.  As outlined in policy, each employee is to get a 30 minute lunch break.  Because of the service line DPS provides, this is not always possible. If on any occasion you do not receive a 30 minute lunch break, it is your responsibility to contact your supervisor, lead or charge person of this so that they can work out relief, adjust the shift or document such for appropriate compensation in the Kronos [time clock] system.  If any of you feel that you have not received your 30 minute lunch break and were not compensated appropriately, please contact Lisa Mitchell in Human Resources. . . . .

Pls.' App. at 177.

Plaintiffs were aware that Mercy's policy provided that PSOs were supposed to take a

thirty minute meal break at some point during their shift, and that if they were unable to obtain

one, they should report it to a supervisor to obtain compensation for interrupted meal breaks.

Indeed, Haviland and Aiken both reported missed meal breaks and received compensation under

Mercy's system,[7] while Patchin testified that he was aware he *could* do so.[8]

---

[7] Haviland testified:

> Q.    While you were working at Mercy, did you make yourself aware of Mercy's policies and procedures that applied to your job?
> A.    Yes, I think so.
> Q.    Did you understand it was your responsibility to make an effort to take a thirty-minute break, for example?
> A.    Yes.
> Q.    And you were familiar that if you didn't get a thirty-minute break, you were to record that; correct?
> A.    At–no.  That's changed since I left.
> Q.    Okay.  Was there ever a time when you were supposed to report if you did not get a thirty-minute break?
> A.    Depending on our supervisors, yes, we tried, but that didn't necessarily mean that we got compensated for them.
> Q.    I understand that that's your claim, but you were supposed to report it; correct?
> A.    Yes.
> Q.    And you understood that; correct?
> A.    Yes.

Pls.' App. at 23 (Haviland Dep.); *see also* Def.'s App. at 816, 842, 852-54, 857 (documentation showing that Haviland was paid for missed meal breaks on June 12, 2006, May 4, 2007, May 19, 2007, May 22, 2007, June 4, 2007, July 5, 2007, and July 13, 2007).

> Aiken testified:

> Q.    As a Mercy security officer did you make sure that you were aware of Mercy's policies and procedures that applied to you?
> A.    Yes.
> Q.    And you knew that you were supposed to try to find a thirty minute uninterrupted lunch break, correct, or meal break?
> A.    Yes.
> Q.    And in fact, you indicated that you reported that on a number of occasions when you didn't have  a break, and you got paid; correct?
> A.    Yes.
> Q.    And so you were familiar that there was a procedure for reporting those sorts of things; correct?
> A.    Yes.

Def.'s App. at 10 (Aiken Dep.).  Despite requesting compensation for "every shift [he] worked at

Mercy Capitol," Aiken testified that he did, in fact, receive compensation for some missed lunch hours while working at Mercy Capitol:

> Q.      There were some [shifts] for which you were compensated?
> A.      Yes.
> Q.      And what were the circumstances where that occurred?
> A.      I have–I contacted my supervisor, and he went ahead and made sure that I was–you know, wasn't able to make a–or take a lunch for that day.
> Q.      Okay.  And what supervisor did you contact that got you paid for that missed lunch?
> A.      That would be Ivan Williams.
> Q.      And when did that occur?
> A.      I couldn't tell you exactly the exact days.
> Q.      A number of times through the years?
> A.      A couple times through the years, yes.
> Q.      And what would make you go to Mr. Williams on a particular day to say you missed your lunch?
> A.      Just the nature of the trip loads that we had.
> Q.      Okay.  And why did you go some days and not others?
> A       Because of–it would show more into our AcTrack, is what–our dispatching screen, that we had more–more trips.
> Q.      Okay.  So did you go to Mr. Williams on days when you were more busy?
> A.      Yes.
> Q.      Okay.  And so you chose the ones where you thought it was more likely that you missed your lunch to go to Mr. Williams?
> A.      Yes.
> Q.      All right.  And the others were the days you didn't feel you had had as many things to do or missed as much time; is that right?
> A.      I–we still had the same amount of time to do things, but it didn't really show as much as–as the other days.
> Q.      Okay.  And so what I'm trying to gather is why you would choose to go to him on some days and not others.  And what I'm understanding you're saying is you chose to go to him on the busier days; is that right?
> A.      Yes.
> Q.      And for those days he did, in fact, approve your lunch; is that correct?
> A.      Yes.

*Id*. at 6.

[8] Patchin testified:

> Q.      While you were at Mercy, did you make sure that you were familiar with

In addition to its policies requiring employees to notify a supervisor if they are not able to get a lunch break, Defendant maintains an incident reporting system, known as the AcTrack system, wherein significant PSO activities are recorded.  *See* Def.'s Facts ¶ 4.  Defendant characterizes the AcTrack system as a "second, redundant tracking system on which any significant interruptions are to be recorded, called incident reports."  *Id.* ¶ 4.  Plaintiffs testified in their depositions that most PSO activities, and certainly any significant incidents that may occur during a PSO's shift, are to be recorded in the AcTrack system.  *See* Def.'s App. at 8-9 (Aiken testifying that PSOs were to make incident reports in the AcTrack system for things such

---

the rules applying to security officers?
A.      Mostly.
Q.      And did you understand that you were expected to do your best to get a thirty-minute uninterrupted meal period?
A.      Yes.
Q.      And did you understand that if you did not get such an uninterrupted meal period, you were to report it?
A.      No.
Q.      And why didn't you understand that?
A.      During my preemployment–or I may have just been just employed at Mercy–I asked Denny regarding this matter, "What happens if I don't get a lunch?"  And he said it was unadvisable to punch out, no lunch.
Q.      Who's Denny?
A.      Denny is the old–I believe he was the manager, Dennis Eichenberry.
Q.      And he said is was unadvisable?
A.      Yeah.
Q.      Did you ever do it?
A.      No.
Q.      Did you understand that the rules allowed you to do it?
A.      Yeah.
Q.      But you chose not to?
A.      Yes.
Q.      But you understood the written rules said, "Hey, if you don't, you better tell us"; correct?
A.      Yes, sir.

*Id*. at 37 (Patchin Dep.).

as "stolen items, trips and falls" and "lost property"), 22 (Haviland testifying that anything that

could result in "liability, litigation, or a loss to the hospital" was to be recorded in the AcTrack

system); 37 (Patchin testifying that he was required to make an incident report in the AcTrack

system any time "there was a patient restraint," when items were "lost and found," and to deal

with "valuables").  In some instances, PSOs contacted dispatch to make the AcTrack entries,

while in other instances, the PSOs were responsible to make AcTrack entries themselves.  *See id*.

at 10, 37.

## III.  STANDARD OF REVIEW

The term "summary judgment" is something of a misnomer.[9]  *See* Hornby, D. Brock,

*Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010).  It "suggests a

judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is

complicated, time-consuming, and expensive.  *Id*. At 273, 281.  The complexity of the process,

however, reflects the "complexity of law and life." *Id*. at 281.   "Since the constitutional right to

jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to

"assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a

record contains genuine factual disputes that necessitate a trial.  *Id*. at 281-82.  Despite the

seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the

summary judgment process is well-accepted and appears "here to stay." *Id*. at 281.[10]  Indeed,

---

[9]  Judge D. Brock Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." Hornby, D. Brock, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273, 284 (Spring 2010).

[10]  Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment.  *Id*. at 281

"judges are duty-bound to resolve legal disputes, no matter how close the call." *Id*. at 287.

Federal Rule of Civil Procedure 56(b) provides that "[a] party against whom relief is sought may move at any time . . . for summary judgment on all or part of the claim." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n.5 (8th Cir. 1975)).  The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627 (1944)).  Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div.*, *Houdaille Indus., Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir. 1975)).

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment upon motion after there has been adequate time for discovery.  Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an

---

(citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944)).  While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement.  *See id*. at 283-88.

element essential to its case, and on which that party will bear the burden of proof at trial. *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is appropriately granted

when the record, viewed in the light most favorable to the nonmoving party and giving that party

the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and

that the moving party is therefore entitled to judgment as a matter of law.  *See* Fed. R. Civ. P.

56(c); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994).  The Court does

not weigh the evidence, nor does it make credibility determinations.  The Court only determines

whether there are any disputed issues and, if so, whether those issues are both genuine and

material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Wilson v. Myers*, 823

F.2d 253, 256 (8th Cir. 1987) ("Summary judgment is not designed to weed out dubious claims,

but to eliminate those claims with no basis in material fact.") (citing *Weightwatchers of Quebec*,

*Ltd. v. Weightwatchers Int'l, Inc.*, 398 F. Supp. 1047, 1055 (E.D.N.Y. 1975)).

        In a summary judgment motion, the moving party bears the initial burden of

demonstrating the absence of a genuine issue of material fact based on the pleadings,

depositions, answers to interrogatories, admissions on file, and affidavits, if any.  *See Celotex*,

477 U.S. at 323; *Anderson*, 477 U.S. at 248.  If the moving party has carried its burden, the

nonmoving party must then go beyond its original pleadings and designate specific facts

showing that there remains a genuine issue of material fact that needs to be resolved by a trial.

*See* Fed. R. Civ. P. 56(e)(2).  This additional showing can be by affidavits, depositions, answers

to interrogatories, or the admissions on file.  *Id.*; *Celotex*, 477 U.S. at 322-23; *Anderson*, 477

U.S. at 257.  "[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of

*material* fact." *Anderson*, 477 U.S. at 247-48.  An issue is "genuine," if the evidence is sufficient

to persuade a reasonable jury to return a verdict for the nonmoving party.  *See id.* at 248.  "As to

materiality, the substantive law will identify which facts are material . . . .  Factual disputes that

are irrelevant or unnecessary will not be counted."  *Id.*

Courts do not treat summary judgment as if it were a paper trial.  Therefore, a

"district court's role in deciding the motion is not to sift through the evidence, pondering the

nuances and inconsistencies, and decide whom to believe."  *Waldridge v. Am. Hoechst Corp.*, 24

F.3d 918, 920 (7th Cir. 1994).  In a motion for summary judgment, the job of a court is only to

decide, based on the evidentiary record that accompanies the moving and resistance filings of the

parties, whether there really is any material dispute of fact that still requires a trial.  *See id.*

(citing *Anderson*, 477 U.S. at 249 and 10 Charles A. Wright & Arthur R. Miller, *Federal

Practice & Procedure* § 2712 (3d ed. 1998)).  It is the responsibility of the parties to provide the

evidence necessary for this assessment.  *Id.* at 921.

## IV.  LAW AND ANALYSIS

Plaintiffs appear to make two alternative claims in this action.  First, they assert that

regardless of how much time they had to engage in personal pursuits while on duty, they were

never actually relieved from their duties at the Mercy Capitol, Mercy Franklin, and Mercy West

Lakes locations because Mercy only staffed one officer at each of those locations.  *Id.* ¶ 19.

Specifically, Plaintiffs contend that PSOs at Mercy Capitol, Mercy Franklin, and Mercy West

Lakes were required to remain on Mercy's premises during their lunch hour, were required to

carry radios, and were required to respond to any emergencies that arose.  Thus, according to

Plaintiffs, they performed the exact same job duties during their half-hour lunch break that they

were required to perform during the paid portions of their shifts, namely, "responding to tasks,

waiting to respond to tasks, responding to incidents and waiting to respond to incidents, and

being a physical presence." *Id.* ¶ 75.  Accordingly, Plaintiffs "seek recovery for every

automatically deducted meal period that they worked that was not reimbursed" at Mercy Capitol,

Mercy Franklin, and Mercy West Lakes.[11]  *Id.* ¶¶ 40-41.  Alternatively, Plaintiffs contend that

---

[11]  With regard to his specific claim, Patchin testified:

    Q.    [H]ow did you select the days for which you're requesting to be reimbursed
            for having missed a meal period?
    A.    Anytime I was a one-man team, no matter what location I was at, there would
            have been more likely of a chance for me to have at least been interrupted at
            minimum or to have missed a complete lunch on those days because I would
            not have had backup to cover my lunch hour.
    Q.    So you're identifying days where you feel there was a chance you could have
            missed lunch, is that right?
    A.    Yes, that's correct.

*Id.* at 35.

    Aiken testified:

    Q.    [Y]ou're seeking compensation for every day you worked at Mercy Franklin
            for missed lunch; is that correct?
    A.    Yes.
    Q.    And the same is true for Mercy Capitol, that you're seeking compensation for
            missed lunch for every shift you worked at Mercy Capitol?
    A.    Yes.

*Id.* at 6.

    Haviland testified:

    Q.    What exactly is your claim in this case?
    A.    That I do not get an uninterrupted 30-minute rest period.
    Q.    Are you contending that during the entire course of your employment with Mercy,
            you've never had a 30-minute break?
    A.    Yes.
    Q.    That's what you're contending.  And that's because you have to have your radio on;
            is that right?

Mercy failed to pay them for discrete instances where their meal periods were interrupted by work duties.

A. *The Purposes of the FLSA and Relevant Statutory Language*

In evaluating an FLSA claim, the Court must consider the language of the statute itself, the corresponding interpretive regulations, and the construction given to these by Supreme Court and Eighth Circuit precedent.  The Court must also carefully consider the legislative purposes of the FLSA in order to determine whether the facts of this case, and the harms claimed by Plaintiffs, are the kind of facts contemplated by Congress and the types of harms which it intended to prevent or rectify by enacting the FLSA.

To fully understand the purpose of FLSA, the statute must be considered against the

---

A.   Amongst various other things, yes.
Q.   I just want to make sure I understand this because I don't think its clear.  Are you contending that you've never actually been able to do what you want for 30 minutes because you are called back for some particular reason or are you contending "Even when I have 30 minutes, that is not my own time"?
A.   Yes, that's what I'm contending.
Q.   The latter?
A.   Yes, both.
Q.   Both?
A.   Yeah.
Q.   So your testimony is that you've never been able to sit for 30 minutes and do what you want to do?
A.   Not without it being a fixed post or a required assignment.

Def.'s App. at 17.  To the extent that Haviland claims he *never* got an uninterrupted 30 minute meal period, it appears he may also be seeking recovery for *some* missed meals at Mercy Main. *See id.* ¶¶ 43, 50-59.  For purposes of Plaintiffs' collective claim that Mercy's meal break policies as a whole are unlawful, however, Haviland's claims in this regard run counter to Plaintiffs' admissions that Mercy Main operates under a different system for granting lunch breaks since multiple officers are on duty at that location.  Accordingly, Haviland's claimed entitlement to compensation for missed meals at Mercy Main will only be considered in the context of Plaintiffs' alternative theory of recovery, i.e., under the theory that Mercy failed to pay Plaintiffs for discrete instances where their meal periods were interrupted by work duties.

-16-

extreme conditions it was created to remedy.  In the 1930s:

> A twelve hour day and seven day week [was] not unusual in restaurants, trucking service, gas filling stations, and retail stores . . . .  A large chain store in Atlanta, Georgia, was requiring employees to work from 63 to 70 hours a week . . . and similar reports came from stores in other industrial centers.  A knitting mill company in Long Island City, N.Y., lengthened its working week to 60 to 72 hours when no longer bound by the [National Recovery Administration] code.[10]

Scott D. Miller, *Revitalizing the FLSA*, 19 Hofstra Lab. & Emp. L.J. 1, 20 (2001) (quoting Labor Research Ass'n, Labor Fact Book III 63-64 (1936)).  In 1938, Congress enacted the FLSA in response to extreme Depression era "labor conditions [that were] detrimental to the maintenance of the minimum standard of living necessary for health . . . ."  *Lyon v. Whisman,* 45 F.3d 758, 763 (3d Cir. 1995) (citing 29 U.S.C. § 202); *see also Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) ("The principal congressional purpose in enacting the [FLSA] was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" (quoting  29 U.S.C. § 202(a)); *Monahan v. County of Chesterfield*, *Va.*, 95 F.3d 1263, 1267 (4th Cir. 1996) (stating that the FLSA was enacted "as the result of Depression era high unemployment and abusive working

---

[10]  The National Recovery Administration Code ("NRA Code") was enacted by the National Recovery Administration under the auspices of the National Industrial Recovery Act ("NIRA") as a "temporary emergency action[] designed to 'provide employment for the large portion of the working population which ha[d] been forced out of work due to the depression and before that to technological changes.'"  Scott D. Miller, *Revitalizing the FLSA*, 19 Hofstra Lab. & Emp. L.J. 1, 20 (2001) (citation omitted).  "From 1933 through mid-1935," the NRA Code "limited the hours of labor per industry, nationally or regionally, to an eight-hour day, forty-hour week."  *Id*.  In 1935, however, the United States Supreme Court determined that the "NIRA was an unconstitutional delegation of legislative authority to the executive branch."  *Id*. (citing *A.L.A. Scheckter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).  "President Roosevelt subsequently terminated the NRA and transferred its 20 functions to other agencies under executive order."  *Id*.

conditions"); *Mechmet v. Four Seasons Hotels, Ltd.,* 825 F.2d 1173, 1176 (7th Cir. 1987) (noting

that workers of the pre-FLSA era endured such long hours that it had a potentially profound

negative impact on their health, and arguably contributed to an unacceptable increase in

workplace accidents).

The legislative history of the FLSA similarly articulates that "the prime purpose of the

legislation was to aid the unprotected, unorganized and lowest paid of the nation's working

population; that is, those employees who lacked sufficient bargaining power to secure for

themselves a minimum subsistence wage." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707

(1945) (providing numerous citations of relevant legislative history documents).  More

specifically, the FLSA was designed "'to extend the frontiers of social progress' by 'insuring to

all our able-bodied working men and women a fair day's pay for a fair day's work.'"  *A.H.*

*Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945) (quoting Message of President Roosevelt to

Congress, May 24, 1934).  Because the foremost purpose of the FLSA was to stop the

exploitation of workers by management, the provisions of the Act are considered "'remedial and

humanitarian in purpose.'"  *Goldberg v. Wade Lahar Const. Co.*, 290 F.2d 408, 415 (8th Cir.

1961) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597, 607

(1944)); *Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 48 (1943) (noting that Congress was

concerned that "persons should not be permitted to take part in interstate commerce while

operating with substandard labor conditions" (citing *United States v. Darby*, 312 U.S. 100, 115

(1941)).  In attempting to effectuate these remedial and humanitarian purposes, the FLSA

proposed to raise labor standards "by establishing minimum wages, discouraging unusually long

work weeks, and eliminating oppressive child labor."  Kelley Jordan, Note, *FLSA Restrictions on*

*Volunteerism: The Institutional & Individual Costs in a Changing Economy*, 78 Cornell L. Rev.
302, 311 (1993) (stating that Congress intended that the FLSA would "affect only the most
poorly paid and overworked employees" (citing H.R. Rep. No. 1452, 75th Cong., 1st Sess., at 9
(1937)).  Today, the "'[t]he two central themes of the FLSA are its minimum wage and overtime
requirements.'"  *Monahan*, 95 F.3d at 1267 (citing *Arnold v. Arkansas*, 910 F. Supp. 1385, 1392
(E.D. Ark. 1995)).

Title 29, United States Code, § 207(a)(1) provides that "no employer shall employ any of
his employees who in any workweek is engaged in commerce . . . for a workweek longer than
forty hours unless such employee receives compensation for his employment in excess of the
hours above specified at a rate not less than one and one-half times the regular rate at which he is
employed."  Section 216(b) provides that any employer who violates the provisions of § 207
"shall be liable to the employee or employees affected in the amount of their . . . unpaid overtime
compensation . . . and in an additional equal amount as liquidated damages."  Section 216 further
provides that an "action to recover the liability prescribed in [§ 216(b)] may be maintained
against any employer . . . in any Federal or State court of competent jurisdiction by any one or
more employees for and in behalf of himself or themselves and other employees similarly
situated."  In such individual or collective actions under the FLSA, the Court may additionally
"allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."  29
U.S.C. § 216(b).

While the FLSA requires that employees be paid for all hours worked, and be paid
overtime compensation for working hours in excess of forty per week, the Act does not define
the term "work" or otherwise clarify what constitutes "working hours."  Title 29, C.F.R. §

785.19, however, makes clear that "bona fide meal periods are not worktime."  The fighting

issue in the present case is whether Plaintiffs' meal breaks were "bona fide meal periods," within

the meaning of the FLSA and corresponding regulations and case law.  If Plaintiffs were

receiving "bona fide meal periods," Defendant was entirely within its rights to deny them

compensation for such periods.  If, on the other hand, Plaintiffs' meal breaks were not "bona fide

meal periods," Defendant would be obligated to provide them overtime compensation for such

periods.  In order to survive Defendant's Motion for Summary Judgment, Plaintiffs must

demonstrate that there are genuine issues of material fact on at least one of their two alternative

theories, i.e., Plaintiffs must show a genuine issue of material fact that:  1) Mercy's meal break

compensation policy is, as a whole, violative of the FLSA, or 2) that Mercy failed to properly

compensate Plaintiffs for all hours actually worked under the FLSA.


B.  *Is Mercy's Meal Break Policy as a Whole Unlawful Under the FLSA?*

Plaintiffs' central assertion in this lawsuit is that Mercy's meal break policy, at least with

respect to the Mercy Capitol, Mercy Franklin, and Mercy West Lakes locations,[11] is a per se

unlawful violation of the FLSA because PSOs at those locations work alone and are never fully

relieved from duty by another officer.  *See* Pls.' Br. at 14-20.  Plaintiffs argue that the default

---

[11]  As noted, Haviland is also claiming that he should be compensated for shifts at Mercy Main. It appears, however, that the Plaintiffs did not intend to include Mercy Main in the "collective" component of this case since Plaintiffs' claims are premised on the argument that Mercy's policy of having only one PSO on duty at the Mercy Capitol, Mercy Franklin, and Mercy West Lakes locations inherently and necessarily deprived them of an uninterrupted thirty minute meal break. Plaintiffs acknowledge that this was not the practice at Mercy Main. *See* Pls.' Facts ¶ 18 ("Mercy Main is staffed by more than one [PSO] and therefore it has been possible for Plaintiffs . . . to leave work for a meal period or take a meal period knowing that their job duties would be covered by another [PSO]."); 43 ("Plaintiffs were occasionally relieved at Mercy Main and do not seek wages for every single lunch period at that location.").

deduction of thirty minutes for lunch out of each 8.5 hour shift leads to a systemic daily

underpayment of all PSOs at any site where complete relief is not provided.  *Id.*  Plaintiffs'

argument in this regard is not about how well Mercy's "no lunch" reimbursement system may or

may not function when employees specifically report a missed lunch break.  Rather, it is a claim

that PSOs working at the Mercy Capitol, Mercy Franklin, and Mercy West Lakes locations are

the victims of systemic, structural undercompensation that is built into the administration of

Mercy's policy, and that this undercompensation happens automatically without many or most

employees even being aware of it.  Pls.' Response to Def.'s Facts ¶ 6 ("Mercy directed

employees to take a meal break but failed to provide them with an understanding of their rights,

and failed to provide them with the tools to obtain relief from their job duties as required by law

and by Mercy policies.").  Indeed, Plaintiffs contend that they were not aware that they were

being chronically underpaid, because they did not understand that they were legally entitled to be

paid for any meal period where complete relief was not provided or where they were still

performing some job duties during the meal period.  *See id.* ¶¶ 6-7 ("Plaintiffs were not given the

knowledge to understand that they had a right to be relieved from time they were engaged to

wait nor were they provided the tools to obtain relief."); ¶ 21 ("The meal period does not have to

be interrupted in order for it to be compensable when the employee is still performing his regular

job duties.").  To be clear, Plaintiffs' arguments are not specifically about whether the Plaintiffs

experienced actual interruptions to their meal breaks on any particular day, but rather whether

the conditions of the meal breaks, in general, were such that Mercy can be found to be in

violation of the FLSA for knowingly failing to compensate Plaintiffs for time spent "working"

within the meaning of the FLSA.

"It is a fact that an employer who knows or should have known that an employee is or was working overtime is obligated to pay overtime." *Jerzak v. City of South Bend*, 996 F. Supp. 840, 845 (N.D. Ind. 1998).  "Moreover, an employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." *Id.* (citing *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981), and *Mumbower v. Callicott*, 526 F.2d 1183 (8th Cir. 1975)).  To prove their claim that all meal periods at Mercy Capitol, Mercy Franklin, and Mercy West Lakes were compensable, Plaintiffs must demonstrate sufficient evidence that, if submitted to a jury, could reasonably lead to a conclusion that Plaintiffs, by virtue of the restrictions Mercy imposed on their meal periods at those locations, were "working" during their unpaid thirty-minute meal periods.  *See Hertz v. Woodbury Co., Iowa*, 566 F.3d 775, 784 (8th Cir. 2009) ("[U]nder the FLSA, the employee bears the burden to show that his or her mealtimes were compensable work."); *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 807 (11th Cir. 1992) ("Whether a certain set of facts and circumstances constitute work for purposes of the FLSA is a question of law.").

In support of their legal position in this case, Plaintiffs rely extensively on 29 C.F.R. § 785.19, asserting that the regulation is "quite clear that employees must be relieved from duty while on lunch breaks."  Pls.' Br. at 15.  Section 785.19 provides:

(a) Bona fide meal periods.  Bona fide meal periods are not worktime.  Bona fide meal periods do not include coffee breaks or time for snacks.  These are rest periods.  The employee must be completely relieved from duty for the purposes of eating regular meals.  Ordinarily 30 minutes or more is long enough for a bona fide meal period.  A shorter period may be long enough under special conditions.  The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating.  For example, an office employee who is required to eat at his

-22-

desk or a factory worker who is required to be at his machine is working while eating.

(b) Where no permission to leave premises.  It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period.

The Court agrees with Plaintiffs that if the "complete relief" standard of § 785.19 were the governing legal standard, Plaintiffs would have a strong factual foundation to survive summary judgment.  Indeed, Plaintiffs would arguably have grounds to bring their own summary judgment motion because Defendant does not seriously dispute that Plaintiffs were never "completely relieved," in the form of being replaced by another officer for the length of the meal period, from job duties at the Mercy Capitol, Mercy Franklin, and Mercy West Lakes locations. However, as will be discussed further *infra*, the "completely relieved" standard of § 785.19 is *not* the governing legal standard.

1.      *Applicable standard:  "Complete relief" versus "predominant benefit."*

The most important cases interpreting the FLSA and expounding upon what constitutes "work" under the Act were decided by the Supreme Court in 1944, just six years after Congress enacted the FLSA.  In *Armour & Co. v. Wantock,* 323 U.S. 126 (1944), the Supreme Court considered whether time "spent on the employer's premises as fire guards subject to call, but otherwise put to such personal use as sleeping or recreation" constituted compensable "working" time under the FLSA.  *Armour*, 323 U.S. at 127.  The employees at issue in *Armour* were firefighters who "clocked-in" for a normal nine-hour shift (8:00 a.m. to 5:00 p.m.), with a half-hour for lunch, performing various inspection, cleaning, and maintenance duties.  *Armour*, 323 U.S. at 127.  At the end of their shift, the employees "clocked-out," but were required to "remain

on call in the fire hall, provided by the Company and located on its property," until the following

morning at 8:00 a.m., when they again "clocked in" to commence normal working duties.  *Id*.

During the "on-call" evening hours, employees were required to remain on-site and to attend to

any emergency or maintenance matters that may arise.[12]  *Id*.  Otherwise, employees were free to

spend "on-call" hours eating, sleeping, or entertaining themselves "pretty much as they chose."

*Id*. at 128.

In affirming the lower courts' findings that the "on-call" hours were compensable

"working" time under the FLSA, the Court noted that "'work or employment . . . as those words

are commonly used,'" means "'physical or mental exertion (whether burdensome or not)

controlled or required by the employer and pursued necessarily and *primarily for the benefit* of

the employer and his business.'"  *Id.* at 132 (emphasis added, quoting *Tenn. Coal*, 321 U.S. at

598).  The Court emphasized, however, that this definitional language was "not intended as a

limitation on the [FLSA]":

> [A]n employer, if he chooses, may hire a man to do nothing, or to do nothing but
> wait for something to happen.  Refraining from other activity often is a factor of
> instant readiness to serve, and idleness plays a part in all employments in a stand-by
> capacity.  Readiness to serve may be hired, quite as much as service itself, and time
> spent lying in wait for threats to the safety of the employer's property may be treated
> by the parties as a benefit to the employer.  Whether time is spent predominantly for
> the employer's benefit or for the employee's is a question dependent upon all the
> circumstances of the case.

*Id*. at 133.  In the case before it, the Court determined that the FLSA "does not exclude as

working time periods contracted for and spent on duty" in the factual circumstances presented

simply because "the nature of the duty left time hanging heavy on the employees' hands and

---

[12]  The time spent on such emergency and maintenance matter averaged less than one half-hour
per week.  *Armour*, 323 U.S. at 127.

because the employer and employee cooperated in trying to make the confinement and idleness incident to it more tolerable." *Id*. at 134.

In a companion case decided the same day as *Armour*, the Court considered a situation where employees of Swift & Co. worked a normal 7:00 a.m. to 3:30 p.m. shift (with a half-hour lunch period), but then "stay[ed] in the fire hall on the Company premises, or within hailing distance, three and a half to four nights a week." *Skidmore v. Swift & Co.*, 323 U.S. 134, 135 (1944). During the evening hours, employees were required to remain on the premises, but were expected to do nothing more than respond to alarms, which were infrequent. *Id*. Employees were provided with sleeping quarters, billiards and dominoes tables, and a radio. *Id*. at 136. They were permitted to sleep or to otherwise entertain themselves as they saw fit, so long as they were readily available to respond to an alarm. *Id*. The district court and appellate court both determined that the "on-call" time was not compensable working time, "apparently restricted by the notion that waiting time may not be work." *Id*. at 140. The Supreme Court found the proposition that waiting time cannot be working time erroneous:

> [W]e hold that no principle of law found either in the statute or in Court decisions precludes waiting time from also being working time. We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts as are the many situations in which employment involves waiting time. Whether in a concrete case such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court. This involves scrutiny and construction of the agreements between the particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the surrounding circumstances. Facts may show that the employee was engaged to wait, or they way show that he waited to be engaged. His compensation may cover both waiting and task, or only performance of the task itself. Living quarters may in some situations be furnished as a facility of the task and in another as a part of its compensation. The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was.

*Id*. at 136-37.  The Court recognized that "[i]n some occupations . . . periods of inactivity are not properly counted as working time even though the employee is subject to call."  *Id*. at 138 (citing, as possible examples, "an operator of a small telephone exchange where the switchboard is in her home and she ordinarily gets several hours of uninterrupted sleep each night; or a pumper of a stripper well or watchman of a lumber camp during the off season, who may be on duty twenty-four hours a day but ordinarily 'has a normal night's sleep, has ample time in which to eat his meals, and has a certain amount of time for relaxation and entirely private pursuits'").  The Court held, however, that the ultimate determination of whether waiting time constitutes working time will generally "depend[] upon the degree to which the employee is free to engage in personal activities during periods of idleness when he is subject to call and the number of consecutive hours that the employee is subject to call without being required to perform active work.  Hours worked are not limited to the time spent in active labor but include time given by the employee to[] the employer."  *Id*. at 138.  Accordingly, the matter was reversed and remanded for further consideration.  *Id*. at 140.

Eight years after *Armour* and *Skidmore*, the Eighth Circuit had occasion to consider whether guards and firemen employed at the Glenn L. Martin plant during World War II were entitled to compensation for their thirty minute "lunch periods."  *Glenn L. Martin Neb. Co. v. Culkin*, 197 F.2d 981, 982 (8th Cir. 1952).  In that case, the guards and fireman were expected to take a thirty minute, unpaid lunch break.  *Id*.  The district court recounted that the guards were permitted to go to either an on-site cafeteria or a smoking area, but were required to remain in full uniform, including visored caps and sidearms, and to respond to any calls for assistance.  *Id*. at 990 (Riddick, J., dissenting, citing the district court's order).  The firemen were also required

to remain in full uniform and to respond to any calls, and were additionally required to carry

plug-in telephones with them. *Id.* Though the district court noted that interruptions to either a

guard or a firefighter's lunch were few, "the mere presence of a guard fully uniformed, anywhere

in the plant area, was a deterrent to lawlessness and necessarily beneficial to the defendant." *Id.*

Likewise, "the firemen were required to be constantly vigilant and consequently, even during the

lunch period, their time was not their own, but belonged to the company." *Id.* A divided panel

affirmed the district court's conclusion that the guards and firemen should be compensated for

their lunch breaks. *Id.* at 988. Despite evidence showing that the guards and firemen were

rarely interrupted during their thirty minute lunch periods, the Court found that the significant

question "was whether they were performing their regular duties during that period and were

then substantially performing the duties assigned to them by their employer and were not free to

follow pursuits of a purely private nature." *Id.* at 984 (citing *Armour* 323 U.S. at 126 and

*Skidmore*, 323 U.S. at 134).

> Although the guards were constantly obliged to prevent disturbances by their
> presence and vigilance, and the firemen were likewise obligated to be constantly
> vigilant to prevent fires, yet both the guards and the firemen served to a considerable
> extent in a stand-by capacity. In the latter respect both were engaged in their regular
> duties during the 30-minute period as effectively as if they were putting down
> disturbances or putting out fires. And if, as the trial court found, these plaintiffs were
> engaged in the principal activity of their regular work during the 30-minute period,
> they were entitled to recover compensation therefor unless defendant is correct in
> one or more of its remaining assignments of error.

*Id.* at 985.

The FLSA's lack of statutory specificity regarding the definition of "work" led the

Department of Labor ("DOL"), in 1961, to articulate general criteria for deciding when an

employee is considered to be "working" for purposes of the FLSA. It is one of these regulations,

§ 785.19, that Plaintiffs cite in support of their contention that an employee can only be deemed "not working" and, thus, not entitled to compensation, when he is "completely relieved from duty." *See* Pls.' Br. at 14-17.  Plaintiffs argue that when the "completely relieved" standard of § 785.19 is applied to their case, the systematic and chronic nature of the underpayment of Mercy PSOs, in violation of FLSA, becomes clear.  Defendant counters that the DOL regulatory interpretation is not controlling because it has properly been overridden by the judicial opinions of Supreme Court and the Eighth Circuit.  *See* Def.'s Br. at 15.

Ordinarily, regulations promulgated by an administrative agency charged with implementation of legislation are presumptively valid and entitled to judicial deference.  *See Nat. R.R. Passenger Corp. v. Boston & Me. Corp.*, 503 U.S. 407, (1992) ("Judicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well settled principle of federal law.") (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)).  With respect to § 785.19 and the other FLSA regulations, however, the DOL has specifically stated that the "ultimate decisions on interpretations of the [FLSA] are made by the courts."  29 C.F.R. § 785.2 (citing  *Skidmore v. Swift & Co.*, 323 U.S. 134, 138 (1944) (finding that the DOL Administrator's interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance").  Indeed, § 785.2 provides that the pertinent regulations are merely designed to articulate "the positions [the DOL] will take in enforcement of the [FLSA]," and to "inform the public of such positions."  Thus, courts considering the import of § 785.19 have noted that it is merely an "Interpretive Bulletin" that, while informative, is not binding.  *See Henson v. Pulaski County Sheriff Dep't*, 6 F.3d 531, 534 (8th Cir. 1993) (noting that regulations such as § 785.19 "do not bind us"); *Blain*

*v. Gen. Elec. Co.*, 371 F. Supp. 857, 860 (W.D. Ky. 1971) (finding that the "30 minute meal period referred to in Section 785.19 is only a broad guide to the Administrator's enforcement policy.  It is not an inflexible standard which binds either the Wage-Hour Administrator or the courts"); *see also Myracle v. Gen. Elec. Co.*, No. 889-2264, 1992 WL 699863, at *7 (W.D. Tenn. Dec. 1, 1992) (concluding that, while "helpful to the court in explaining the enforcement policy of the [DOL] with regard to meal periods," § 785.19 is not "binding or determinative" and does not "represent legal standards which the court is bound to follow"), *affirmed by Myracle v. Gen. Elec. Co.*, No. 92-6716, 1994 WL 456769, at *6 (6th Cir. 1994) (finding the district court correctly afforded "some, but not complete deference" to the DOL "Interpretive Bulletin"). Accordingly, in 1993, after considering the "'the thoroughness evident in [§ 785.19's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control," the Eighth Circuit rejected the "completely relieved" standard of § 785.19, adopting in its stead the "predominant benefit" standard.  *Henson*, 6 F.3d at 534.

In *Henson*, the Eighth Circuit considered two separate FLSA appeals that had been combined for consideration.  *Id*. at 533.  In the first of the two cases,[13] the plaintiff patrol officers sued the defendant police department for failing to compensate them for meal periods.  *Id*. at 536.  Each patrol officer was given a half-hour meal period per shift.  *Id*.  Officers were required to obtain permission before beginning their break, but were permitted to return to the station to change into civilian clothes and to travel to their destination before the half-hour period was

---

[13]  The first case was an appeal from the decision in *Houser v. North Little Rock Police Department*, No. LR-C-92-111, 1992 WL 540814 (E.D. Ark., Dec. 8, 1992).

deemed to commence. *Id*. While on break, the officers were permitted to "go wherever they please," and although they could "be approached by members of [the] public at times," they had no work-related duties other than "monitor[ing] their radios and [] respond[ing] in the case of an emergency. . . . Most importantly, the officers may and do tend to personal errands." *Id*. The district court granted summary judgment in favor of the police department, and the Court of Appeals affirmed, finding that the minimal restrictions on the officers' lunch break freedoms "could not support a finding that the patrol officers spend their meal breaks predominantly for the benefit of their employer." *Id*. ("The officers have a full thirty minutes to use for their own purposes and in which to travel to any desired location, subject only to the possibility of being recalled in an emergency.").

In the second of the two cases under consideration in *Henson*,[14] the plaintiffs were sheriff's deputies assigned as correctional officers at a jail. *Id*. The deputies received a thirty-minute unpaid lunch period, wherein they were required to remain on the jail premises, though they were permitted to go to their cars or run across the street to a fast food restaurant to pick up food if they had permission. *Id*. During the lunch break, deputies were relieved of regular duties and were free to do "anything they wish," though they were required to respond to any emergency calls. *Id*. The magistrate judge assigned to the case granted summary judgment in favor of the deputies, finding that they were "required to perform 'active or inactive' duties while eating and that these duties restrict their personal freedom to such an extent that they are not completely relieved from duty." *Id*. at 536-37. The Circuit reversed the grant of summary judgment in favor of the deputies, concluding that "[s]ummary judgment for the deputies would

---

[14] The second case was an appeal from the decision in *Henson v. Pulaski County Sheriff's Department*, No. LR-C-91-281, 1993 WL 438769 (E.D. Ark., Sept. 17, 1993).

be proper only if because of the 'active or inactive' duties the deputies are required to perform while eating they spend their meal breaks *predominantly for the benefit of the Department*." *Id.* at 537 (emphasis added).  Because the record was insufficiently developed to make that determination, the Court remanded the matter to the trial court for further consideration.  *Id.* ("Although the deputies must spend their meal breaks on the jail premises and an emergency interrupts approximately twenty percent of their breaks, we cannot say as a matter of law that because of these requirements the deputies spend their meal breaks predominantly for the benefit of the Department.").

In the *Henson* cases, the Court explicitly adopted the "predominant benefit" test as "the appropriate test for determining the compensability of meal periods under the FLSA," despite the fact that both plaintiff groups urged the Court to employ the "completely relieved" standard of § 785.19.  *Id.* at 533-34.  After serious consideration, the Court found that the DOL regulation "lacks persuasive authority" because it is "inconsistent with the Supreme Court's longstanding interpretation of the [FLSA] and would mandate the application of a rigid rule in the face of the Supreme Court's direction that courts take a practical approach based on the unique facts of each case."  *Id.* at 535.  In particular, the Court was troubled by the inflexible nature of the DOL standard, noting that, in application, the "completely relieved" standard "means that employees who remain subject to call during their meal breaks must always be compensated for that time, because they continue to perform an 'inactive' duty and are not completely relieved of duty."  *Id.* at 534.  The Circuit found it "unrealistic to hold that an employer must compensate employees for all meal periods in which the employee is relieved of all duties except simply remaining on-call to respond to emergencies, which the completely-relieved-from-duty standard would

-31-

seem to require." *Id.*

In adopting the "predominant benefit test" as the governing standard for determining

mealtime compensability, the Eighth Circuit stated that the standard "comports with the Supreme

Court's admonition to use a practical, realistic approach under the unique circumstances of each

case when deciding whether certain activities constitute compensable work." *Id.* at 534 (citing

*Skidmore*, 323 U.S. at 140 ("Each case must stand on its own facts.") and *Armour*, 323 U.S. at

133 ("Whether time is spent predominantly for the employer's benefit or for the employee's is a

question dependent upon all the circumstances of the case.")).  The Court further noted that the

majority of circuit courts of appeals have rejected the "complete relief" standard and embraced

the "predominant benefit" standard.  *See id.* at 537 (citing *Lamon v. City of Shawnee, Kan.*, 972

F.2d 1145, 1155 (10th Cir. 1992) (interpreting DOL "completely relieved" standard as meaning

that the test for compensability is whether the meal period is spent "predominantly for the

benefit of the employer")); *see also Birdwell*, 970 F.2d at 808 ("The question of whether the

employees are working during [on-call] time for purposes of the FLSA depends on the degree to

which the employee may use the time for personal activities," i.e., "whether 'the time is spent

predominantly for the employer's benefit or for the employee's'");  *Bright v. Houston N.W. Med.*

*Ctr. Survivor, Inc.*, 934 F.2d 671, 677 (5th Cir. 1991) ("[T]he 'critical issue' in cases of this kind

[is] 'whether the employee can use the [on-call] time effectively for his or her own purposes.'");

*Hill v. United States*, 751 F.2d 810, 814 (6th Cir. 1984) (concluding as a matter of law that postal

workers were not spending meal times predominantly for the benefit of their employer where the

employee "was not required to perform any activities that could be characterized as substantial

duties")).

-32-

Despite some seeming inconsistency between *Glenn* and *Henson*, the *Henson* Court emphasized that it had, in *Glenn* and other cases, applied the "predominant benefit" standard either "expressly or implicitly in various situations to determine whether certain activities constitute work under the [FLSA]."  6 F.3d at 534 (citing *May v. Ark. Forestry Comm'n*, 993 F.2d 632, 639 (8th Cir. 1993) (approving jury instruction that incorporated the predominant benefit standard) and *Glenn*, 197 F.2d at 985); *see also Reimer v. Champion Healthcare Corp.*, 258 F.3d 720, 725 (8th Cir. 2001) (finding that on-call employees who were permitted to leave the employer's premises and pursue virtually unrestricted activities, save for drinking alcohol or taking mind-altering drugs, were not spending their time "predominantly for the benefit of their employer" and thus, were not entitled to compensation under the FLSA).  Thus, in light of the compelling arguments made by the Eighth Circuit, and the binding authority of its opinion in *Henson*, this Court finds that the "predominant benefit" standard is the appropriate test to employ in analyzing the compensability of Plaintiffs' meal breaks.

2.      *Application of the predominant benefit standard to Mercy's meal break policy.*

a. *Plaintiffs' assertions of "presence" as compensable work time.*

Plaintiffs assert that "[t]he main job duties of the public safety officers included responding to tasks, waiting to be engaged to respond to tasks, acting as a visual deterrent, and simply being a presence in the facilities to which they were assigned." Pl.'s Br. at 4.  The Court agrees that the record supports a finding that these are *some* of the job duties of PSOs.  Other duties included monitoring activities going on inside and outside the hospital, processing and transporting valuables belonging to patients, ensuring that agitated patients do not hurt themselves or others, releasing bodies from the morgue, responding to helicopters, securing

-33-

parking lots, locking and unlocking doors, and conducting security checks and walk-throughs of the hospital.  Pls.' App. at 66-67 (Lisa Mitchell Dep.); 182-199 (duty descriptions for various shifts and locations).  According to Plaintiffs, since "the reason the [PSOs] are there in the first place is to deter bad behavior and be able and willing to respond in case there is an emergency," Plaintiffs are "working" at all times, even at times when they are seemingly engaged in purely personal pursuits such as eating, reading, or surfing the internet.  *Id.* at 18.  Stated another way, Plaintiffs contend that "Mercy seeks to obtain a free half hour from each employee by automatically deducting time from their paycheck for them performing their jobs in the exact same manner as they did . . . at other time periods throughout the 8.5 hour shift."  Pls.' Facts ¶ 104.

Plaintiffs' arguments are premised on the notion that Defendant must pay PSOs for all meal break periods where officers were not relieved of *all* duties, because Defendant benefitted from the deterrence value of the *presence* of the PSOs on site during their break periods, just as Defendant benefitted from their *presence* during paid portions of each PSO's shift.  *See* Pls.' Br. at 20 (charging that Mercy "got away with not having to pay another officer [for relief], but still took in the benefit of having the hospital secured").  In essence, Plaintiffs' argument in this regard is that Defendant "engaged them to wait" for something to happen, and that they were "engaged to wait" both during their paid hours and during their unpaid meal breaks.  Plaintiffs' argument highlights a conceptual issue that lies at the heart of this dispute.  Most jobs do not allow both the employer's and the employee's interests to be served simultaneously.  If an employee is engaged in work for his employer, he generally cannot pursue purely private interests at the same time.  There is a mutual exclusivity such that, for most jobs, the benefit of

an employee's time can be allocated to only one party at a time.  Thus, typically there is a clear

distinction between time spent eating (a personal benefit) and time spent working (a company

benefit).  However, there are some exceptions to this rule for firefighters, security guards, and a

handful of other professions where an employee's inactive presence by itself begets a meaningful

value upon the employer.  As evidenced by the Court's review of case law *infra*, defining

"work" versus "break time" can be challenging simply because it mixes together different

categories or dimensions of work.   That is, the traditional "performance" dimension of "work" is

intermingled with a conception of work unfamiliar to most people, i.e., the "engaged to wait"

concept, which can also be referred to as a "presence" conception of work.

In a case such as this one, a distinction must be made between active (performance)

duties and passive (presence) duties.  Unquestionably, both types of duties provide value to the

employer.  Indeed, Mercy is benefitted both by having PSOs perform daily scheduled tasks and

respond to emergency calls (active duties) and by merely having PSOs on-site at one of its

facilities, ready to respond should a need arise (a passive duty).  When PSOs perform passive

duties, there is an overlap between their ability to pursue their own purely private interests and

their ability to perform a service for Mercy.  PSOs performing passive duties can have their own

personal needs met and also simultaneously meet some of Mercy's needs, simply by eating their

lunch at the Mercy facility rather than going off site.  In contrast with most jobs, there is no

"either/or" tradeoff in which one party's gain is the other's loss.  If a PSO is not fully relieved by

another officer, but rather remains on-site where he is viewable by others or can quickly respond

if needed, then Mercy gets the same benefit from that PSO's "presence" as it does during the

same PSO's time on the clock.  In other words, Mercy's PSOs are able to continue providing

passive benefits even while fully enjoying lunch or other purely private pursuits during their 30-minute respite.

Thus, the Court is here faced with a situation where both Mercy and the PSOs will necessarily have some of their needs met during the mandated meal periods. Such a situation inherently means that one of the parties will receive an "extra benefit" beyond that which it could normally expect. That is, if Mercy does not pay PSOs for their meal periods, but continues to receive value in the form of the PSOs' "presence," then it naturally follows that Mercy is receiving a benefit from the PSOs for "free." If, on the other hand, Mercy is required to pay PSOs for a lunch period wherein they are able to pass their time predominantly in pursuit of their own interests, then the PSOs are receiving compensation for time that most workers would not be paid for, merely because Mercy receives a correspondent benefit. Obviously, under Mercy's current meal break system, Mercy is the recipient of the "extra benefit" because it does not pay PSOs at the Mercy Capitol, Mercy Franklin, and Mercy West Lakes locations for meal break periods, despite the fact that it receives some benefit from their presence. As discussed *supra*, however, the FLSA was designed, not to limit benefits to employers, but to eliminate real harms to employees. Thus, Mercy's receipt of this "extra benefit" is only unlawful under the FLSA if Plaintiffs can offer evidence, sufficient to create a genuine issue of material fact, that their meal break periods are spent "predominantly for the benefit of [Mercy]." *Henson*, 6 F.3d at 537.

b.      *Factors to be considered in applying the "predominant benefit" test.*

In support of their claim that a PSO is "working" at all times at the Mercy Capitol, Mercy Franklin, and Mercy West Lakes locations, Plaintiffs generally assert that the principal activity of their regular work was waiting for something to happen that required a response, i.e.,

-36-

Plaintiffs were "engaged to wait" and they undertook to perform this passive duty both during their paid shift time and during their unpaid meal breaks.  Pls.' Br. at 32 ("Plaintiffs have alleged that because of the type of work they are required to do, which is to sit and wait to respond to an emergency, act as a deterrent and simply be a presence at Mercy Capitol and Mercy Franklin, they should be paid for the hours spent engaged in those job duties regardless of whether they also had time to read, surf the web or eat.  The issue is not food; the issue the lack of freedom from work duties and performing work duties that requires compensation.").  More specifically, Plaintiffs contend that they were *never* able to take an uninterrupted thirty minute meal break, because:  1) they were not permitted to leave Mercy's premises; 2) they were required to keep their radios on and respond to situations that may arise; 3) they were performing the job duty of being a "presence" both while on paid shift time and while on their unpaid meal breaks; and 4) they were the only officer on duty.[15]  Plaintiffs argue that summary judgment in favor of Defendants must be denied because the very nature of Mercy's lunch break policies with respect to locations where PSOs were the only officer on duty mandated that "the public safety officer[s] remained engaged in the 'principal activity of their regular work.'"  *Id*. at 19 (quoting *Glenn*, 197

---

[15]  *See* Def.'s App. at 3 (Aiken testifying that at Mercy Franklin, "you're always on call.  You're subject to get called out at any time of your lunch break or any break that you take.  You're not allowed to leave anywhere.  We're not allowed to clock out at that time."); 14 ("Q: [Y]our complaint is you're not able to leave site; is that correct?  Aiken:  Correct.  Q.  Anything else that you're complaining about?  Aiken:  That we're the only person at that site.  We're not relieved of our post."); 15 (Haviland testifying that "We must have a radio on at all times" and "I've always got a radio squawking in my ear"), 17 (Haviland testifying that his claim of an inability to get an uninterrupted 30-minute rest period is based on the fact that he has to have his radio on and because his assignments were "fixed post or a required assignment"); 27-28 (Haviland testifying that the cause of his interrupted meal periods is having to stay on-site and have his radio on); 30 (Patchin testifying that he was unable to get an uninterrupted meal period because "I could not do what I wanted in the fact that I was stuck on campus.  I was unable to leave."); *see also* Pls.' App. at 147-169 (Declarations of the various named and opt-in Plaintiffs stating that they "performed the same job duties throughout the entire 8.5 hour shift").

F.2d at 985).

The Court concurs with Plaintiffs that an employee who is "engaged to wait" *may* be entitled to compensation for that waiting time.  *See Skidmore*, 323 U.S. at 136 ("[W]e hold that no principle of law found either in the statute or in Court decisions precludes waiting time from also being working time.").   Plaintiffs' citation to *Glenn*, however, fails to account for the entire standard articulated therein:   "[T]he question . . . was whether [the employees] were performing their regular duties during that period and were then substantially performing the duties assigned to them by their employer *and were not free to follow pursuits of a purely private nature*." *Glenn*, 197 F.2d at 984 (emphasis added).  This full enunciation of the *Glenn* standard aligns with the "predominant benefit" standard articulated in *Henson*, which provides that employees are only entitled to compensation in situations where, "because of the 'active or inactive' duties [the employees] are required to perform while eating they spend their meal breaks predominantly for the benefit of the [employer]."  6 F.3d at 537.  Other circuits have formulated the predominant benefit test in substantially the same way.  *See*, *e.g.*, *Bernard v. IBP, Inc.*, 154 F.3d 259, 264, 265-66 (5th Cir. 1998) (stating that the critical issue is "whether the meal period is used predominantly or primarily for the benefit of the employer or for the benefit of the employee"); *Alexander v. City of Chicago*, 994 F.2d 333, 339 (7th Cir. 1993) (stating that the "FLSA requires remuneration for meal periods during which [an employee] is unable comfortably and adequately to pass the mealtime because the [employee's] time or attention is devoted primarily to official responsibilities"); *Lamon*, 972 F.2d at 1157-58 ("If during meal periods a police officer's time and attention are primarily occupied by a private pursuit, presumably the procurement and consumption of food, then the officer is completely relieved

-38-

from duty and is not entitled to compensation under FLSA.  Conversely, a police officer is entitled to compensation for meal periods if the officer's time or attention is taken up principally by official responsibilities that prevent the officer from comfortably and adequately passing the mealtime."); *Roy v. County of Lexington, S.C.*, 141 F.3d 533, 545 (4th Cir. 1998) ("[W]e believe the most appropriate standard for compensability is a 'flexible and realistic' one where we determine whether, on balance, employees use mealtime for their own, or for their employer's benefit."); *Hill*, 751 F.2d at 814 ("[A]s long as the employee can pursue his or her mealtime adequately and comfortably, is not engaged in the performance of any substantial duties, and does not spend the time predominantly for the employer's benefit, the employee is relieved of duty and is not entitled to compensation under the FLSA.").  Thus, the Court cannot look solely at the fact that Mercy benefits from Plaintiffs' meal break "presence" in determining whether Plaintiffs' claim to meal time compensability may proceed; rather, the Court must evaluate all of the circumstances of the case to determine if Plaintiffs have satisfied their burden to proffer sufficient evidence from which a jury could reasonably conclude that Plaintiffs' meal break time is spent predominantly for Mercy's benefit.  *See Armour*, 323 U.S. at 133 ("Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case."); *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) (finding that employee "has the burden of proving that he performed work for which he was not properly compensation"); *Myracle*, 1994 WL 456769, at *4 ("[I]t is the employee who bears the burden of proving that he or she performs substantial duties and spends his or her meal time predominantly for the employer's benefit.").

        While there is no precise formula, courts have considered a variety of factors in

evaluating whether employees' meal break periods are spent for the predominant benefit of their employer.  Such factors include:  the limitations and restrictions placed upon the employees, the extent to which those restrictions benefit the employer, the duties for which the employee is held responsible during the meal period, the frequency in which the meal periods are interrupted, and whether employees are allowed to resume an interrupted break.  *See Bernard v. IBP, Inc. of Neb.*, 154 F.3d 259, 266 (5th Cir. 1998); *Myracle*, 1994 WL 456769, at * 5.  The Court will consider each of these factors in turn.

       c.     *Individual consideration of the predominant benefit factors.*

With respect to the limits and restrictions Mercy placed upon PSOs working at the Mercy Capitol, Mercy Franklin, and Mercy West Lakes locations, Plaintiffs point out that they are not permitted to leave Mercy's premises during a meal break period, and that they must carry a radio and respond to situations that may arise.  Numerous courts, including the Eighth Circuit in *Henson*, have declined to find that an employer's requirement that an employee carry a radio and respond if necessary converts meal time to work time.  *See, e.g., Henson*, 6 F.3d at 536 (affirming summary judgment in favor of employer where plaintiff police officers were required to monitor radios and respond to emergencies at all times); *Avery v. City of Talladega, Ala.*, 24 F.3d 1337, 1347 (11th Cir. 1994) (finding that no reasonable jury could find police officers' time spend predominantly for benefit of employer where, amongst other things, officers were required to leave radios on); *Aiken v. City of Memphis, Tenn.*, 190 F.3d 753, 759 (6th Cir. 1999) (rejecting the notion that commuting time is converted to working time merely because plaintiffs were required to monitor their radios and respond to emergencies they either observe or that are communicated to them by radio dispatch and noting that "the amount of work involved in

monitoring a police radio during a commute is simply de minimus"); *Bridges v. Amoco Polymers, Inc.*, 19 F. Supp. 2d 1375, 1379 (S.D. Ga. 1997) ("Neither the case law nor the Act state or suggest that the mere fact that an employee may be recalled from their lunch break amounts to a severe restriction.  Indeed, such logic would arguably cause most all lunches to be compensable, for most every employee in the Nation is subject to having his lunch hour interrupted by his employer in some fashion or another to handle a "big event."); *In re Chicago Police Dep't F.L.S.A. Meal Period Litig.*, Nos. 89C9354, 90C7294, 92C667, 94C2237, 1995 WL 144500, at *5 (N.D. Ill. Mar. 30, 1995) (granting summary judgment in situation where officers were required to carry radio units at all time, remain in radio contact, and "respond to both calls for information and calls regarding police emergencies"); *Albee v. Village of Bartlett, Ill.*, 861 F. Supp. 680, 688 (N.D. Ill. 1994) (finding that police officers who were required to monitor their radios and respond to emergency calls were not acting for predominant benefit of employer during meal periods).

Likewise, substantial law supports a finding that merely requiring an employee to remain on the employer's premises does not convert meal break time into compensable working time. *See*, *e.g.*, *Agner v. United States*, 8 Cl. Ct. 635, 638 (1985) ("The mere fact that an employee is required to eat lunch on the employer's premises and to be on a duty status, subject to emergency call during such period, does not convert [time where employees may 'eat, rest or engage in any other appropriate personal activity'] into compensable time." (quotations and citations omitted)); *Marti v. Grey Eagle Distrib., Inc.*, 937 F. Supp. 845, 852 (E.D. Mo. 1996) (concluding that meal break time was not working time merely because employees were required to remain on the employer's premises and stating that the DOL regulations "do not require that an employee be

-41-

allowed off the employer's premises during a break period in order to exclude the time from

hours worked" (citing 29 C.F.R. § 785.16)); *Brown v. Howard Indus.*, 116 F. Supp. 2d 764, 766-

67 ("The Court . . . has not found a single case in which a court held a lunch break compensable

simply because the employees were required to stay on their employer's premises during that

break."); *Baylor v. United States*, 198 Ct. Cl. 331, 364 (1972) ("[T]he mere fact that an employee

is required to eat lunch on the employer's premises and to be on a duty status, subject to

emergency call during such period, does not convert this private leisure time into compensable

time.") (*overruled on other grounds by Doe v. United States*, 372 F.3d 1349 (Fed. Cir. 2004)).

Indeed, the DOL, when asked for an advisory opinion on the compensability of meal break time

where employees were "restricted to a small lunchroom and cannot change clothes, make phone

calls, or smoke, and cannot leave the building," found that "the mere fact that the employees are

not allowed to leave the premises and are otherwise slightly restricted in their activities during

the meal period does not make the time hours worked."[16]   Def.'s App. at 778 (DOL Letter

FLSA2004-7NA, dated August 6, 2004).

     With respect to the extent to which Mercy's restrictions on PSOs benefit Mercy, it is

clear from the record that Mercy received a benefit by having PSOs remain on-site as a

"presence," ready to respond to emergencies.  By requiring PSOs to remain on Mercy's

---

[16] It is worthy of note that 29 C.F.R. § 785.19(b) provides that "It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period."  Plaintiffs assert that this subsection means that, if a employee is required by his employer to remain on the employer's premises during meal breaks, that the employee must be "completely relieved" in the traditional sense of being relieved from job duties by another individual.  *See* Pls.' Br. at 15-16.  The Court does not find Plaintiffs' argument convincing, given the Eighth Circuit's explicit rejection of the "completely relieved" standard in favor of the "predominant benefit" standard.  Accordingly, the Court views the ability of an employee to leave the premises as merely another factor for consideration in determining whether meal breaks are spent for the predominant benefit of the employer.

premises, monitor their radios, and respond to emergencies, Mercy does not have to pay additional PSOs to be present at the Mercy facilities during any given PSO's break time, yet still has someone ready to respond quickly should the need arise.  The fact that Mercy benefits from the restrictions it imposes on Plaintiffs, however, is not alone determinative, i.e., the mere "fact that [Mercy] benefits from the restrictions [imposed on Plaintiffs' meal breaks] does not mean that the [P]laintiffs' meal breaks are predominantly for [Mercy's] benefit" for purposes of the "predominant benefit" test.  *Avery*, 24 F.3d at 1347; *see also Lamon*, 972 F.2d at 1149 (rejecting the notion that "the performance of any official duty, no matter how insignificant, during meal periods rendered the time compensable"); *Myracle*, 1994 WL 456769, at *5 ("The question is not simply whether [the employer] receives benefit from the plaintiffs' meal break . . . the crucial question is whether plaintiffs are engaging in substantial duties during their meal periods . . . .").  Indeed, in determining whether the restrictions on the PSOs' meal break time makes the time spent predominantly for Plaintiffs' benefit or for Mercy's benefit, the Court must look not just at what Plaintiffs *could not do* during their lunch breaks; it must also look at what Plaintiffs *could*, and *in fact did*, do during their lunch breaks.[17]  In this case, Plaintiffs admit that they "engage in substantial activities during the workday," including "looking at pictures of women in lingerie and bikinis, reading books, reading newspapers, reading magazines, studying, making personal

---

[17]   Because this is a collective action, the opt-in Plaintiffs' claims "stand or fall along with [those of Haviland, Patchin, and Aiken, the named representative plaintiffs] with respect to existence or nonexistence of liability on the part of the defendant."  *McReynolds v. Louisville Taxicab & Transfer Co.*, 5 F.R.D. 61, 62 (W.D. Ky. 1942); *see also Hunter v. Sprint Corp.*, 346 F. Supp. 2d 113, 120 (D.D.C. 2004) (noting that collective actions proceed as representative actions); *Shushan v. Univ. of Colo.*, 132 F.R.D. 263, 264 (D. Colo. 1990) ("Once consent is filed, the section 216 action is maintained by the named plaintiffs 'for and in behalf of' the person who has consented.").

phone calls, surfing the Internet, playing on-line games, checking personal e-mails, typing

papers, watching movies, smoking, playing cards, viewing pornography, getting snacks, going to

convenience stores and playing chess."  Pls.' Facts ¶ 94.

As to what duties Plaintiffs were responsible for during their breaks, the Court can

discern no affirmative duties imposed on Plaintiffs by Mercy other than the requirements that

they remain on the premises, monitor the radio, and respond to emergency calls for assistance.

While Plaintiffs have pointed out numerous duties that Mercy required them to perform during

the course of their shifts, such as performing building checks, patrolling the halls, or monitoring

the parking lots, the record is devoid of evidence that Mercy expected, let alone required, PSOs

to perform any of those duties while on break.  Indeed, none of the Plaintiffs dispute that

Mercy's policy required PSOs to be "responsible for making an effort to take a lunch break," or

to make "arrangement for relief" should it become apparent that "there will be insufficient time

to break for lunch."  Def.'s App. at 41; *see also id*. at 10, 23, 37 (Aiken, Haviland, and Patchin

each testifying that he was aware that Mercy's policies required him to take a thirty minute meal

break per shift or to report an inability to obtain a meal break).  At best, Haviland stated in a very

general fashion that he is "always required to be responsible for something or be doing

something."  Pls.' App. at 38-39.  This generalized assertion, however, is not supported by any

other evidence in the record and does not, standing alone, generate a genuine issue of material

fact as to whether PSOs were required or expected to perform substantial job-related duties

during their break periods or whether Mercy knew that PSOs were performing tasks, beyond

those identified (remain on-site, monitor radios, respond), during their lunch periods.[18]

---

[18]  Upon review of the record, the only specific reference the Court can find about what was
expected from PSOs during their lunch periods, is in the Declaration of Michelle Booker, who

The final factors for consideration in the "predominant benefit" calculus are the frequency of interruptions and the ability of an employee to resume an interrupted meal period. Though the gravaman of Plaintiffs' collective action case is that they are inherently working through their meal periods because they are performing the same duties during that time as during the paid portions of their shifts, it appears that Plaintiffs may be attempting to claim that specific interruptions to their meal periods were so frequent that they weigh in favor of a finding that Plaintiffs were spending their meal breaks predominantly for Mercy's benefit. *See* Pls.' Br. at 11. For instance, Plaintiffs point to testimony by Patchin estimating that he was interrupted during a lunch period "six times a month, maybe . . . some less, some more."[19] Pls.' App. at 76. In regard interruptions in general, Patchin testified that "[w]e would get calls over the radio, we'd have to take off. We hear a fire alarm bell, we take off." *Id*. at 77. Plaintiffs also point out that Aiken testified that he gets interrupted during his lunch "80% of the time" at Mercy Franklin "by doing building checks, having patients come in the main door." *Id*. at 6.

The Court recognizes that otherwise non-compensable on-call or break time may become compensable if the interruptions to that time are frequent. *See, e.g.*, *Renfro v. City of Emporia*, 948 F.2d 1529, 1531-32 (10th Cir. 1991) (finding on-call time compensable where firefighters had documented an average of four to five calls per day that required a response, thus substantially restricting their personal pursuits). Plaintiffs' generalized assertions of "interruptions," however, are legally insufficient evidence to sustain the inference that Plaintiffs

---

states that during her lunch breaks, she is "not required to sit at a desk or actively monitor any equipment." Pls.' App. at 170-71.

[19] Patchin agrees that, otherwise, he was "able to enjoy a full, uninterrupted lunch period." Pls.' App. at 76.

desire.  That is, given the fact that Plaintiffs all testified during their depositions that they could

not identify anything that actually interrupted their meal periods on any day they worked for

Mercy,[20] Plaintiffs' vague and generalized assertions of frequent interruptions lend little to the

analysis of whether their time was spent predominantly for Mercy's benefit, rather than for their

own.  *See*, *e.g.*, *Bacon v. Hennipin County Med. Ctr.*, 550 F.3d 711, 716 (8th Cir. 2008) (stating

that a "plaintiff 'must substantiate allegations with sufficient probative evidence that would

permit a finding in plaintiff's favor'" (quoting *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638

(8th Cir. 2005)); *Helfter v. United Parcel Serv.*, 115 F.3d 613, 616 (8th Cir. 1997) (finding

"general statements" insufficient to defeat properly supported summary judgment motion);

*Aamold*, 39 Ct. Cl. at 742 (finding that plaintiffs failed to sustain their burden to offer "sufficient

evidence to show the amount and extent of work" for which they were not compensated when

their "evidence of meal-time interruptions [was] of a very general nature"); *Perkins v. City of

Rochester*, 641 F. Supp. 2d 168, 171 n.1 (W.D.N.Y. 2009) ("A party cannot defeat summary

judgment by []offering different, fluctuating or wholly contradictory versions of the salient

events."); *Bridges*, 19 F. Supp. 2d at 1379 (finding a plaintiff's "conclusory statements that []

interruptions occur often" insufficient to show that interruptions occurred with sufficient

frequency to make her break time compensable working time under the FLSA).  In this regard,

---

[20] *See* Def.'s App. at 14 (Aiken Dep.:  "Q.  You can't identify anything on any of these days that
suggests that you didn't get an uninterrupted thirty-minute meal break; correct?  A. Correct.");
27 (Haviland Dep.:  "Q.  You're not going to be able to identify any particular person that ever
interrupted you and prevented you from getting lunch now this long after the fact, are you?  A.
No.  Q.  In fact, you're not going to be able to identify any duties or responsibilities that
interrupted you this long after the fact; correct?  A. Correct."); 38 (Patchin Dep.:  "Q.  For any of
those days on Exhibit 1 are you going to be able to tell me for any of those days that you were
not able to get an uninterrupted thirty-minute break?  A.  No.").

-46-

the Court finds the case similar to *Wilson v. City of Chicago*, where a plaintiff police officer

claimed that his meal periods were spent predominantly for his employer's benefit because he

was "unable to leave" and "must respond" to calls during his meal period.  No. 02C3379, 2004

WL 2095675, at *6 (N.D. Ill. 2004).  In support of his claim that his meal breaks predominantly

benefitted his employer, the plaintiff referenced 10-15 instances where other officers were called

from their lunch break for work duties, and asserted that there were obviously additional

instances where meal periods were interrupted.  *Id.*  Despite being unable to recall any specific

instances where he was called off his lunch period, the plaintiff argued that "a reasonable jury

could nevertheless find that there were such instances."  *Id.*  The district court disagreed and

granted summary judgment on Plaintiffs' meal claim in favor of the employer, stating:  "If

Plaintiff himself cannot recall even a single instance in which he was required to perform police

work during his lunch break, no reasonable jury could find that such instances occurred."  *Id.* at

*7.  The Court finds this conclusion apt, and accordingly, determines that Plaintiffs have failed

to generate a genuine issue of material fact as to whether they suffered significant or frequent

interruptions to their meal periods.  Moreover, Plaintiffs have failed to offer any evidence that

would support a finding that, if a meal period was actually interrupted, that they were not

permitted to continue it at a later time, or otherwise claim compensation therefore.  Further,

Plaintiffs all specifically admitted that they were aware of the requirement to inform a supervisor

if a meal period had actually been interrupted, so that they could either be relieved or be paid for

the missed meal period and they point to no evidence that they were impeded in their ability to

inform a supervisor of an interrupted meal period.[21]  Finally, the Court notes that the AcTrack

---

[21]  Plaintiffs do argue that Defendant "encouraged Plaintiffs not to report absences at Mercy
Main," Pls.' Br. at 34, citing the fact that Patchin claims a now-deceased supervisor told him "it

record of daily events shows extensive periods of uninterrupted time each day and Plaintiffs have

not pointed to any specific interruption to refute this evidence.  Indeed, Plaintiffs all provided

testimony indicating that AcTrack would provide a reasonably reliable record of significant daily

events and activities.  *See generally* Def.'s App. at 10-14; 24- 28, 37-38.

     d.  *Totality of the circumstances.*

     Viewing each of the "predominant benefit" considerations in isolation, it is clear that

none would support a finding that Plaintiffs' were acting for Defendant's predominant benefit

during their meal periods.  To determine whether Plaintiffs have sustained their burden to create

a genuine issue of material fact as to whether they spent their meal periods predominantly for

Mercy's benefit, however, the Court must consider the totality of all the relevant circumstances

---

was unadvisable to punch out no lunch." Pls.' App. at 81.  Plaintiffs also point out that Michelle Booker reported missing lunches, but was told "that was just the way the job goes and sometime requires you to miss a lunch." *Id*. at 35.  With regard to the supervisor's assertion that it was "unadvisable" to punch out no lunch, the Court finds the comment so ambiguous, standing alone, that no reasonable juror could rely on it to support Plaintiffs' desired inference.  Indeed, as Defendant points out, the comment could just as easily "reflect well justified skepticism that employees who devoted hours a day to personal Internet activities and studying really could not get a meal." Def.'s Br. at 29.  The more significant reason that Plaintiffs' argument fails, however, is the fact that the comment was made to Patchin alone.  There is no evidence that any other employee was ever discouraged from reporting missed meal periods, and this single comment does not warrant a broader inference that Mercy had a "policy" of discouraging employees from claiming compensation for missed lunches, particularly where there is substantial evidence that Plaintiffs and other PSOs used the reported system and, in fact, were paid for missed lunch periods.  To the extent that Plaintiffs claim Booker's reporting of a missed lunch period put Mercy on notice that employees were routinely not being paid for missed lunches, the Court again finds this evidence insufficient to permit a reasonable jury to reach the desired inference.  While Plaintiffs assert that Booker reported two missed lunch periods and was not paid for them, her testimony was far more ambiguous that Plaintiffs contend.  Booker was asked, "Have you ever not been able to take a lunch?" Pls. app. at 17.  She replied, "there's been a time, yeah, or two when I've not been able to take a lunch." *Id*.  Later in the deposition, Booker responded affirmatively when asked if she had ever told any of her "supervisors or anyone in HR that you weren't able to get a lunch break?" *Id*.  Booker did not, however, state the number of occasions on which she reported missed lunches, and when asked if she was paid, Booker merely stated, "Not that I recall." *Id*.

of Plaintiffs' meal periods.  *See Priddy v. City of Kiowa*, No. 95-1410-JTR, 1997 WL 109692, at

*3 (D. Kan. Jan. 16, 1997) ("The key in analyzing any FLSA case is to evaluate all the

circumstances surrounding the restrictions on an employee's personal pursuits and then

determine whether the time is spent predominantly for the employer's benefit or the

employee's.").  Here, Plaintiffs admit that if they were permitted to leave the premises, and were

only subject to being called back to duty during their meal periods, "that would create a clear

record of complete relief."  Pls.' Br. at 15-16.  Plaintiffs contend, however, that when viewing all

of the factors together, Plaintiffs should be compensated for their meal periods because

Defendant has not identified any case law "supporting denying payment for 30-minute meal

breaks of employees who were not permitted to leave the premises but were still required to

carry a radio, be visible[22] and be at the ready to respond to whatever needs to be responded too

[sic]."  *Id*. at 16.  Moreover, Plaintiffs insist that Defendant's case law citations are insufficient

to support Defendant's position because none of it "deals with an employer, like Defendant, who

permits its employees to engage in a number of time killing tasks while they are engaged to wait

for incidents during all hours of a shift, not just the approximate meal period time frame."  *Id*.

Plaintiffs primarily rely on *Reich v. Southern New England Telecommunications Corp.* in

support of their position that Defendant's Motion for Summary Judgment should be denied.

Pls.' Br. at 19-20 (citing *Reich*, 121 F.3d 58 (2d Cir. 1997)).  In *Reich*, the Second Circuit upheld

the compensability of meal times for employees that were required to remain at their work

premises during lunch in order to provide security for the employer's outdoor equipment.  *Id*. at

63, 65.  The plaintiff employees in *Reich* were "outside craft employees" who used valuable

---

[22] Notably, Plaintiffs have pointed to no evidence in the record that would support an inference
that PSOs were required to be "visible" during their meal break periods.

equipment, belonging to their employer, Southern New England Telecommunications Corp. ("SNET"), to install telephone and communications equipment. *Id.* at 62-63. Part of the job responsibilities of the employees was to maintain and protect SNET's equipment at all times. *Id.* at 62. In order to accomplish this job duty at outdoor job sites, employees were required to bring their lunch to work and to stay at the work site during their 30 minute unpaid lunch period. *Id.* Employees were further required to take their lunch breaks "at or near the work site, often in the cab of a truck or near a manhole, trench, or telephone pole." *Id.* at 63. They were required to "maintain awareness of all activity in and around the job site" and "could be subject to discipline for leaving an open job site unattended during a lunch period." *Reich v. S. New England Telecomm. Corp.*, 892 F. Supp. 389, 393 (D. Conn. 1995).[23] Workers were "responsible during their lunch periods for keeping the public away from the job sites to prevent injuries," in some cases to monitor beepers and radios, and to undertake a "myriad of other responsibilities that may arise during the lunch period," such as reviewing blue prints, filling out time sheets, or discussing the job with their supervisors, who often visited job sites during the lunch period. *Id.* at 394-95. The district court found that the "undeniabl[e]" picture painted at trial was that "the outside craft employees were required to remain at open job sites during their lunch period to perform substantial duties for the benefit of SNET and its business." *Id.* at 396 (discussing how the various job positions carried out "compensable responsibilities and duties on open job sites" for, on average, 60-80% of their lunch periods per week).

On appeal, the employer argued that the employees' lunch breaks were predominantly for

---

[23] The Second Circuit "assume[d] familiarity" with the district court opinion and "restate[d] only those facts necessary for disposition of the appeal." *Reich*, 121 F.3d at 62. Because the appellate opinion gives a rather cursory review of the relevant facts, the Court relies on the more detailed factual articulation of the district court opinion where necessary.

their own benefit, and not SNET's benefit, "because during their lunch break the workers' safety and security roles are wholly passive, leaving them free to eat their meal." *Reich*, 121 F.3d at 65. The Second Circuit found that the employer's argument, "whatever its superficial appeal, misses the point":

> During their lunch break, the workers are restricted to the site for the purpose of performing valuable security service for the company. The importance, indeed indispensability, of these services is evidenced by the mandatory nature of the restrictions that surround the workers' lunch break. To be sure, the workers perform different services during meal breaks than throughout the rest of the day, but the workers' on-site presence is solely for the benefit of the employer and, in their absence, the company would have to pay others to perform those same services. By not compensating these workers, SNET is effectively receiving free labor.

*Id*. at 65. The Second Circuit further rejected SNET's argument that a finding of liability would require any employer to pay employees where the complex nature of the job-setup requires workers to remain on-site during their meal periods, stating that SNET's argument "fails to acknowledge that the workers are not compelled by 'the nature of their work' to remain on the job site," but rather "were required to do so by  their employer, on pain of discipline, for the purpose of providing important (albeit non-taxing) security, maintenance and safety services." *Id*. at 65-66.

The Court finds the facts in *Reich* distinguishable from the present case. First, there is a distinct difference between the environment in which the *Reich* employees were required to take lunch and the environment in which Plaintiffs take their lunch. The *Reich* employees were required, on pain of discipline, to eat within very close proximity to their work site, either "in the cabs of their trucks or next to manholes, trenches or telephone poles at which they are working." *Reich*, 892 F. Supp. at 393. If conditions warranted, the *Reich* plaintiffs might "be required to

spend their lunch periods holding a tarp over telephone plant to protect the wires from rain," "check that the pumps and blowers are still functioning," and "pump groundwater out of manholes." *Id.* In contrast, Mercy's PSOs, while admittedly restricted to the site at which they were working, were able to enjoy their meal periods in either a break room, office, or squad room, in an environment conducive to reading, studying, or relaxing, and with virtually unlimited access to every form of electronic entertainment and communication.[24] *See* Pls.' App. at 4 (Aiken testifying that PSOs took lunch in the break room at Mercy Franklin, in the PSOs' private office at Mercy Capitol, and in the squad room at Mercy Main). Moreover, the *Reich* employees provided specific and detailed examples of the job duties they were required to perform while on lunch break, of the types of interruptions that impeded their lunch breaks, and of the frequency with which such interruptions or tasks arose. The Plaintiffs, by comparison, have made only generalized assertions that they "could not do what [they] wanted in the fact that [they were] stuck on campus,"[25] they were "responsible to always be doing something or be

---

[24] To the extent that Plaintiffs contend this case is factually similar to *Glenn*, the Court finds it is not. The nature of employment has fundamentally changed in the nearly six decades since *Glenn* was decided. *Glenn* was decided before the emergence of the electronic entertainment and communications age. Compared to modern workers, there were very few "pursuits of a purely private nature" that employees could engage in during their lunch breaks while confined to a cafeteria or smoking area. *Glenn*, 197 F.2d 981 at 990. Indeed, the vast majority of the private pursuits that were regularly enjoyed by the Mercy PSOs (desktop movies, on-line entertainment, email, personal cellular telephones, etc.) were not available in the early 1950s. Therefore, in *Glenn*, the benefit balance between the employer and employee tipped the predominant benefit scale to the side of the employer under the break conditions there available, turning lunch time into compensable working time. By contrast, the abundant array of purely private benefits available to Plaintiffs in this case, both during their official lunch breaks and throughout their shifts, tips the predominant benefit scale toward the employees, as their ability to follow pursuits in their own personal interests is substantially enhanced due to modern conveniences.

[25] Pls.' App. at 77 (Patchin Dep.).

assigned a location,"[26] or that "they were subject to get called out"[27] during their lunch breaks at any time while working at Mercy Capitol, Mercy Franklin, or Mercy West Lakes.  Plaintiffs, however, have failed to provide even a single discrete instance where one of their lunch breaks at those locations was *actually* interrupted, and Plaintiffs have failed to proffer any evidence that, during their meal periods, they were actually, with Mercy's knowledge, performing any job duties other than carrying radios and being available to respond to calls should the need arise.

Plaintiffs also argue that the second of the *Henson* cases mandates a conclusion that this case should be submitted to a jury because of disputed factual issues.  Pls.' Br. at 17-18.  The Court disagrees.  The second *Henson* case involved the appeal of a grant of summary judgment in favor of the plaintiff employees.  *Henson*, 6 F.3d at 537.  Similar to the present case, the prison guards in *Henson* continued to "perform their duty of maintaining order during meal breaks by remaining on the jail premises to respond to emergencies."  *Id*.  The Circuit Court determined that genuine issues of material fact prevented it from finding summary judgment in favor of either party, however, because there was conflicting testimony regarding the extent to which the employer was benefitted by requiring employees to stay on site, the extent to which that benefit to the employer interfered with the deputies' ability to attend to personal matters during their breaks, and whether employees who were interrupted during their breaks actually lost time from their meal periods.  *Id*.  In contrast, Plaintiffs have failed to come forth with evidence identifying the frequency, nature, and extent of interruptions to their meal periods.  Moreover, the record here is substantially more robust overall, and there is no significant

---

[26]   *Id*. at 41 (Haviland Dep.).

[27]   *Id*. at 6 (Aiken Dep.).

disagreement as to *what* the facts surrounding Plaintiffs' meal periods are, enabling the Court to more confidently analyze the legal import of issues that the *Henson* court had to leave for jury consideration because of the paucity of the record it had to work with and the factual disputes therein.  That is, while the *Henson* record was insufficient to clarify whether the passive duties of the security guards may have excessively interfered with their ability to attend to personal matters during their lunch breaks, the record in this case poses no such problem.  In this electronic age, Mercy has been able to provide the Court with hundreds of pages of documentation concerning Internet usage, time tracking information, and video surveillance, all of which confirm the testimony of the Plaintiffs themselves that their lunchtime "presence" duties did not interfere with their ability to comfortably pursue a wide array of personal interests for one-half hour per shift.

It appears that Plaintiffs would like the Court to conclude that because Defendant "permitted" Plaintiffs to engage in activities for their personal benefit during the paid portions of their shifts, that Defendant has somehow waived its entitlement to claim that time Plaintiffs spent engaged in personal activities on unpaid meal breaks is not working time.  This position is simply untenable.  The mere fact that Defendant *allowed* PSOs to engage in personal activities during paid working time does not mean that such activities constituted work.  Indeed, the "predominant benefit" test is inapplicable to the paid portions of Plaintiffs' shifts because Mercy has agreed to pay Plaintiffs for that time, regardless of whether they were engaged in personal or business pursuits.  *See* 29 C.F.R. § 778.320 (stating that parties may agree that otherwise uncompensable time constitutes "hours worked"); *Hammond v. Lowe's Home Ctrs., Inc.*, 316 F. Supp. 2d 975 (D. Kan. 2004) (noting that employers may contractually provide benefits to

employees that exceed the mandates of the FLSA).  The issue in the present case is not whether

Plaintiffs should or should not be paid for time that Mercy has already agreed to compensate.  It

is whether Plaintiffs were "working," within the meaning of the FLSA, during the time Mercy

designated as meal break time.

After careful consideration, and viewing the facts and evidence in this case in the light

most favorable to Plaintiffs, and giving Plaintiffs the benefit of all reasonable inferences, the

Court does not believe that the undisputed circumstances of Plaintiffs' break periods could

permit a reasonable jury to conclude that Plaintiffs were, by virtue of Mercy's policies, acting for

the predominant benefit of Mercy during their lunch periods merely because they were required

to remain on site, carry a radio, and respond to emergencies if they arose.  Upon reviewing the

case law applying the predominant benefit test, the Court understands the test to require that the

employer receive a substantial benefit *at the expense of the employee.  See*, *e.g.*, *Dade County,

Fla. v. Alvarez*, 124 F.3d 1380, 1384 (11th Cir. 1997) ("Whether an off-duty activity is

conducted predominately for the benefit of the employer depends on the degree to which an

employee's freedom is undermined by the work-related activity."); *Lamon*, 972 F.2d at 1155-57

(stating that an employee "must primarily be engaged in work-related duties during meal periods

to warrant compensation therefor.  That [an employee] is on-call and has some limited

responsibilities during meal periods does not perforce mean [he] is working"); *Bayles v. Am.

Med. Response of Colo., Inc.*, 937 F. Supp. 1477, 1485 (D. Colo. 1996) ("An employee is

entitled to compensation for meal times when he cannot enjoy his meal time because his

attention is focused on work responsibilities.  However, where an employee's attention is

predominantly spent on personal activities such as eating or relaxing, the employee is relieved

from duty and, therefore, not entitled to compensation.").  That is, if the employee has had all of his legally required needs met during a lunch break, then the mere fact that some benefit might also accrue to the employer will not require compensation, since the employer's benefit has not come at the expense of the employee.

Despite Plaintiffs' attempts to generate factual disputes out of purely legal issues, there is no real factual dispute in this record as to what Plaintiffs' meal break duties were, or as to any of the other relevant considerations.  *See Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 910 (9th Cir. 2004) ("The nature of the employees' duties is a question of fact, and the application of the FLSA to those duties is a question of law."); *Birdwell*, 970 F.2d at 808 ("It is for the court to determine if a set of facts give rise to liability [under the FLSA]."). The parties are in agreement that Mercy policies required Plaintiffs to take an unpaid thirty-minute unpaid meal break; that PSOs working at Mercy Capitol, Mercy Franklin, and Mercy West Lakes were the only officer on site; that PSOs working at those locations were not permitted to leave the premises, were required to carry their radios, and were required to respond if called for emergencies.  The parties further agree that PSOs had "significant amounts of downtime throughout their shifts," and that Plaintiffs engaged in "substantial activities during the day" that inured to their own benefit.  And while Plaintiffs have attempted to assert that they were "constantly interrupted," they offer no evidence in support of this contention, nor do they offer evidence that they were not permitted to make up interrupted meal break time at any other point during their shifts.

On these undisputed facts, the Court need not weigh the evidence or assess credibility to determine that Plaintiffs' passive meal break duties did not interfere with their "ability to attend to personal matters during their meal breaks," even when acknowledging the fact that Plaintiffs'

"presence" on-site during their meal periods benefitted Mercy in certain ways. *Henson*, 6 F.3d at

537.  Indeed, the evidence clearly demonstrates that, during their meal breaks, Plaintiffs were

permitted to "enjoy their meals (should they choose to eat) adequately and comfortably," subject

only to the requirement that they remain on site, carry a radio, and respond to emergencies. *See*

*Avery*, 24 F.3d at 1345.  Plaintiffs were permitted to, and in fact did, engage in a wide array of

personal activities, including making phone calls, studying, eating, sleeping, and using Mercy's

computer equipment to access personal email, websites, and shopping.  While Plaintiffs were not

disciplined for also engaging in such activities during the paid portion of their shifts, the relevant

question for purposes of the predominant benefit test is whether, *during the meal break*,

employees "are unable comfortably and adequately to pass the mealtime because the

[employees'] time or attention is devoted primarily to official responsibilities."  *Lamon*, 972 F.2d

at 1155-56.

       While the Court recognizes that the determination of whether employees are "working"

for the purposes of the FLSA will, in many instances, be a jury question that can only be

determined after "balancing all relevant circumstances and assessing the credibility of widely

varying accounts of the plaintiffs' freedoms and restrictions," *Brinkman v. Dep't of Corr. of*

*State of Kan.*, 804 F. Supp. 163, 173 (D. Kan. 1992), the factual record in this case reveals a

distinct lack of evidence regarding the nature and frequency of meal period interruptions.

Merely pointing out that Plaintiffs were required to remain on the premises, carry a radio, and

respond to emergencies does not, without such evidence, support a conclusion that Plaintiffs

were working during their meal periods.  While the fact that Plaintiffs are required to remain on

Mercy's facility makes this case a closer one than it might otherwise be,[28] the Court nonetheless believes that the ultimate question of whether Plaintiffs were "unable comfortably and adequately to pass the mealtime" because their attention was "devoted primarily to official responsibilities" must be answered in the negative, due to Plaintiffs' failure to proffer evidence that they were required to perform any substantial job duties, evidence demonstrating the nature, extent, and frequency of interruptions, or evidence tending to show that Plaintiffs were regularly unable to carve out a thirty-minute time period to relax and enjoy their lunches or to otherwise engage in personal pursuits. *See Reimer*, 258 F.3d at 724 (affirming summary judgment and concluding that nurses were spending on-call time predominantly for their own benefit in situation where  nurses were not paid for off-premises, on-call time, even though they were required to be reachable by cellular phone or beeper, were prohibited from using alcohol or mind-altering drugs or medication, and were required to report to the hospital within twenty minutes in the event they were summoned); *Rokey v. Say & Zimmerman*, 157 F.2d 734, 735, 738 (8th Cir. 1946) (affirming directed verdict in favor of employer in situation where firemen were

---

[28] For example, in *Armour*, the plaintiffs were entitled to compensation for evening hours where they were required to remain on the employer's premises and to respond to calls, despite the fact that they were permitted to engage in a variety of activities in their own interests. *Armour*, 323 U.S. at 127.  As the law has developed in the sixty-plus years since *Armour*, however, the implications of being required to remain on an employer's premises have diminished somewhat in their significance due to the increased opportunities to conduct personal business remotely. The more significant consideration, however, is the fact that in *Armour*, the employer was not paying the firefighters for *eight hours* per evening, whereas in the present case, the Plaintiffs are not paid for only *thirty minutes.*  The distinction is highly relevant because the predominant benefit test inquires into the "degree to which the employee may use [break] time for personal activities." *Birdwell*, 970 F.2d at 808.  The ability to attend to purely personal pursuits off of an employer's premises is necessarily hindered in this matter by the very short period allotted for meal periods, meaning the on-premises requirement is dramatically less intrusive on an employee's ability to use the time to his personal benefit than was the case in *Armour*.

not paid for eight of twenty-four hours on duty and were required to remain on the premises, because they were free to sleep, relax, read, play games, listen to the radio or "otherwise occupy their time" and where, if called to duty, the firefighters were paid for their time)[29]; *Hill*, 751 F.2d at 811-12 (affirming summary judgment in favor of employer and finding that employees were not deprived of "a free lunch period during which they could serve their own interest and do as they pleased" where postal carriers had one-half hour deducted from his pay for lunch periods, despite the fact that he was permitted to take his lunch at only one of three lunch places "chosen by him and approved by his supervisors," was  required to travel to the authorized lunch place "by an authorized line of travel," had to stay in uniform, remained at all times highly visible to the public, was "not relieved of accountability for all mail, money and equipment entrusted to his care," and according to the plaintiff, was required to "furnish customers with postal information and postal forms, and to accept letters and prepaid first-class mail from customers"); *Birdwell*, 970 F.2d at 807 (finding that plaintiff detectives had a sufficient ability to use their time for their own benefit, despite being in on call, required to stay at home unless they owned a beeper or provided a phone number where they could be reached at all times, and were prohibited from drinking alcohol).

---

[29]  The Court further notes that in *Rokey*, the plaintiffs offered "evidence of some work done by employees during the period from midnight to 8:00 a.m., for which they were not compensated." 157 F.2d at 738.  Believing that this evidence was offered, not as a basis of compensation, but "to invoke a finding that this rest period was not such in fact," the Court held that it was "clear that nearly all of these duties could readily have been performed at some other time of the day." *Id.*  This observation is particularly compelling in the present case, where Plaintiffs clearly had substantial periods of free time, unencumbered by any active job duties, yet claim that they were routinely unable to find thirty-minutes to spend engaging in activities of a purely private nature.

Bolstering the Court's conclusion that a reasonable jury could not find that Plaintiffs were spending their meal periods for the predominant benefit of Mercy is the fact that Mercy had in place a system, which all Plaintiffs knew of, and which two of the three representative Plaintiffs in fact used, to compensate Plaintiffs for days when they were unable to get thirty minutes of interrupted meal time.  Several courts have determined that such a system is consistent with the purposes of the FLSA.[30]  *See Bayles*, 937 F. Supp. at 1487 (finding that ambulance drivers were not entitled to compensation for meal periods where they "remained on call and their duties were the same during meal times [as during paid portions of their shifts]," and where the employer had a system whereby employees could claim compensation for a missed meal period); *In re Chicago Police Dep't F.L.S.A. Meal Period Litig.*, 1995 WL 144500, at *9 ("If the Officers do not work, they do not get paid.  If the Officers work, they get paid.  We find this policy to be logical."); *see also Reimer*, 258 F.3d at 724 (nurses paid if actually called to duty); *Rokey v. Say & Zimmerman*, 157 F.2d 734, 735, 738 (8th Cir. 1946) (firefighters paid if actually called to duty).

C.  *Plaintiffs' Claims of Discrete Instances of Unpaid Overtime Compensation*

---

[30] Plaintiffs argue in their resistance brief that Defendant "did not keep adequate records of employee's work" because it could have, but did not, permit PSOs to clock out during their lunch periods or to record lunch periods through the AcTrack system.  Pls.' Br. at 28-29 (citing *Mumbower*, 526 F.2d at 1187, for the proposition that employees' estimations of missed meal breaks and times should govern a damage award when an employer fails to keep proper records).  Plaintiffs concede, however, that "[s]imilar to not allowing employees to clock out for a 30-minute period of time, not keeping track of them on AcTrack is not by itself illegal or wrong." *Id*. at 29.  A similar argument, in virtually identical circumstances, was rejected in *Bayles*.  937 F. Supp. at 1485-86.  There, ambulance drivers that claimed they did not receive a meal period were required to submit "an 'extra time slip' documenting the missed meal." *Id*. at 1485.  "Management would then review the call out records [similar to the AcTrack system] to determine whether the employee was entitled to take payment." *Id*.  The court found this record-keeping system adequate for purposes of the FLSA. *Id*. at 1487.

Plaintiffs contend that even if Mercy's policies pass muster under the FLSA as a matter of law, factual questions still exist concerning whether Mercy had knowledge of at least several missed breaks, yet still refused to pay.  Pls.' Br. at 9.  Plaintiffs urge that "if an employee provides testimony that he was not always allowed to complete meal periods because they were interrupted, there is a question of fact."  *Id*.  Plaintiffs' assertions in this regard speak not to the legality or substance of Mercy's policies generally, but instead to whether or not Mercy implemented those policies in a way that appropriately compensated Plaintiffs for all time worked.  Put another way, even if plenty of break time was generally available, and even if Plaintiffs' ordinary responsibilities during that break time were not compensable as work, Plaintiffs contend that there were still instances where their break times were interrupted by work-related exigencies or emergencies that precluded Mercy PSOs from enjoying an undisturbed thirty-minute meal period.

To sustain a claim that Plaintiffs are entitled to compensation for unpaid overtime, Plaintiffs bear the burden of proving, by definite and certain evidence, that they performed work for which they were not properly compensated.  *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) (superseded by statute on other grounds).  If Plaintiffs can raise a genuine issue of material fact concerning both the occurrence of interrupted meal periods, and Mercy's failure to compensate for such meal periods, summary judgment in favor of Defendant would be improper on the narrow claim that specific working days merit reimbursement.  The Court notes, however, that Plaintiffs' burden requires them to prove more than *de minimus* uncompensated working time.  *See Mt. Clemens Potter*, 328 U.S. at 692 (finding that "disputes of only a few seconds or minutes of work beyond the schedule working hours" are *de minimus* and do not give rise to

-61-

FLSA liability); *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1414 (5th Cir. 1990) (stating that the *de minimus* doctrine permits an employer to "disregard insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes").  Based on record before it, the Court finds that Plaintiffs have failed to sustain their burden and that summary judgment in favor of Defendant is warranted.

      1.     *Evidence of meal period interruptions.*

     Each Plaintiff expressly admitted during deposition that he could not identify a single meal period that was interrupted.  *See* Def.'s App. at 14 (Aiken affirming that he could not "identify anything on any of [the days he is claiming he should be compensated for] that suggests [he] didn't get an uninterrupted thirty-minute break"); 20 ("Q:  Can you identify any particular date in the last two years where you were not able to take a 30-minute break?  Haviland:  Not at this time or this documentation.  Q.  But you have no independent recollection of any particular date?  Haviland:  Not mentally, no."); 38 (Patchin affirming that he could not identify anything that inhibited him from getting a 30-minute uninterrupted meal break on any of the days he claims he was deprived of such a lunch break).  This testimony alone is sufficient to defeat Plaintiffs' claim of entitlement to overtime payment for discrete interrupted meal periods, though the lack of interruptions is further confirmed by Plaintiffs' failure to show any evidence from any other witness to an interruption, from Mercy's mandatory incident reporting AcTrack system, or from Mercy's meal disruption reporting system, that they ever had an interrupted meal period for which they were not compensated.  *See*, *e.g.*, *Harvill v. Westward Commc'n, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (upholding summary judgment in favor of employer

where employee "presented no evidence of the amount or the extent of hours [she] worked

without compensation"); *Daniels v. Finish Line, Inc*., No. 2:07-cv-1501, 2008 WL 4814008, at

*3 (E.D. Cal. Oct. 31, 2008) (finding summary judgment in favor of employer proper where

employee "'submitted no evidence beyond bare allegations and vague undocumented estimates

to support his claim [that his employer] did not provide adequate compensation and that he was

forced to work off the clock'" (quoting *Harvill*, 433 F.3d at 428)); *Simmons v. Wal-Mart Assoc.,

Inc*., No. 2:04-cv-51, 2005 WL 1684002, at *10 (S.D. Ohio July 19, 2005) (finding summary

judgment in favor of employer proper where employee "fails to identify a single specific day" on

which he worked off the clock at his employer's direction); *Wilson*, 2004 WL 2095675, at *7

("If Plaintiff himself cannot recall even a single instance in which he was required to perform

police work during his lunch break, no reasonable jury could find that such instances

occurred.").

 Plaintiffs, nonetheless, point to certain dates where they claim to have "worked" during

their lunch periods, but claim they were denied compensation.  As discussed, *supra*, Aiken and

Patchin both submitted lists of days for which they allege that they should be compensated.  *See*

Pls.' App. at 178 (email from Aiken to Lisa Mitchell); 180 (letter from Patchin to Lisa Mitchell).

Other than generalized assertions that they were working for Mercy's benefit, however, Plaintiffs

have failed to identify anything that actually interrupted their meal periods on the days asserted.

Indeed, Aiken and Patchin both testified that they simply listed all days they worked at the

Mercy Capitol, Mercy Franklin, or Mercy West Lakes facilities, without regard to whether they

did or did not, in fact, receive an uninterrupted meal period on those dates.  Pls.' App. at 12

(Aiken testifying that, to compile the dates submitted for payment, he simply "looked back onto

our duty sheets" to determine if he worked or not); Def.'s App. at 35 (Patchin testifying that he

was "not really sure whether [he] got a lunch or didn't get a lunch on the dates [he] indicated.").

Mercy provided the Court with one month's worth of internet activity logs for each of the named

Plaintiffs.  These logs also demonstrate an abundance of free time on the dates for which

Plaintiffs claim compensation.[31]

---

[31] For Aiken, these activity logs for the month of November 2006 total 153 pages.  *See* Def.'s
App. at 43-196.  In his December 6, 2006 email to Lisa Mitchell, Aiken claimed that he should
be compensated for missed meal periods on, amongst other dates, November 1, 5, 10, 18, and 28,
2006.  Pls.' App. at 178.  For those dates, Mercy's internet activity logs show the following:

*        On November 1, 2006, Aiken had 358 internet "hits" between the hours of 3:00 p.m. and
8:00 p.m. (82 in the first hour of his shift; 0 in the second; 83 in the third; 175 in the fourth; and
18 in the fifth).  *Id*. at 43-47.

*        On November 5, 2006, Aiken had 1997 internet "hits" between the hours of 3:00 p.m.
and midnight (101 in the first hour of his shift; 273 in the second; 256 in the third; 17 in the
fourth; 135 in the fifth; 477 in the sixth; 178 in the seventh; and 560 in the eighth).  *Id*. at 52-66.

*        On  November 10, 2006, Aiken had 1027 internet "hits" between the hours of 3:00 p.m.
and 11:00 p.m. (39 in the first hour of his shift; 92 in the second; 109 in the third; 41 in the
fourth; 176 in the fifth; 266 in the sixth; 169 in the seventh; and 135 in the eighth).  *Id*. at 97-106.

*        On November 18, 2006, Aiken had 1029 internet "hits" between the hours of 3:00 p.m.
and 11:00 p.m. (89 in the first hour of his shift; 147 in the second; 0 in the third; 3 in the fourth;
87 in the fifth; 359 in the sixth; 154 in the seventh; and 190 in the eighth).  *Id*. at 118-27.

*        On November 28, 2006, Aiken had 1526 internet "hits" between the hours of 3:00 p.m.
and 11:00 p.m. (168 in the first hour of his shift; 18 in the second; 136 in the third; 332 in the
fourth; 133 in the fifth; 195 in the sixth; 99 in the seventh; and 445 in the eighth).  *Id*. at 170-83.

        The Court notes that the internet sites accessed overwhelmingly appear to be personal,
rather than work related internet sites, including, amongst other websites, ebay, yahoo, Des
Moines Area Community College, and a website called killsometime.com.

        Patchin, like Aiken, informed Lisa Mitchell in a writing that he was claiming missed
lunches due to "no coverage," including, amongst others, July 22 and 24, 2006.  On July 22,
2006, Mercy's internet logs show 308 internet "hits" on largely personal sites between the hours
of 6:00 a.m. and 3:00 p.m. (40 in the first hour of his shift; 112 in the second; 26 in the third; 28

Haviland, on the other hand, identified two specific days for which he claims he worked but was not compensated.  *See id*. at 176 (Haviland claiming "at least 10 minutes" of missed lunch on "Saturday, September 8, 2006" due to relieving other officers responding to a helicopter); 179 (Haviland claiming "no meal break" on October 5, 2007).  The record shows, however, that Haviland was paid for the October 5, 2007 incident, *see* Def.'s App. at  816, 857, and that Haviland spent, quite literally, hours on the internet on the night he claims he missed ten minutes of his lunch period.  *See* Def.'s App. at 796-810 (showing that Haviland had 3805 internet "hits" between 9:00 p.m. on Friday, September 8, 2006 and 6:00 a.m.[32] on Saturday, September 9, 2006).[33]  Under such circumstances, the Court can only characterize any potential interruption to Haviland's lunch break on September 8, 2006  as *de minimus*.

>    2.    *Estoppel/waiver.*

Defendant also correctly points out that Plaintiffs are estopped from claiming discrete instances of uncompensated overtime because they failed to employ Mercy's missed meal

---

in the fourth; 22 in the fifth; 1 in the sixth; 13 in the seventh; and 7 in the eighth, and 59 in the ninth).  Def.'s App. at 536-41.  On July 24, Patchin's internet logs show 679 internet "hits" between 7:00 a.m. and 3:00 p.m. (62 in the first hour of his shift; 81 in the second; 142 in the third; 109 in the fourth; 246 in the fifth; 15 in the sixth; 4 in the seventh; and 20 in the eighth).  *Id*. at 545-53.  The Court notes that the sheer level of internet activity, coupled with the lack of evidence of significant interruptions in the AcTrack system, and, indeed, the lack of evidence demonstrating actual interruptions in the first instance, strongly supports a conclusion that Plaintiffs had ample time to carve out a thirty minute uninterrupted meal period.

[32]  Haviland had 205 internet hits on overwhelmingly personal, rather than business related sites, in the first hour of his shift; 563 in the second; 517 in the third; 764 in the fourth; 416 in the fifth; 480 in the sixth; 508 in the seventh; 343 in the eighth, and 9 in the ninth.

[33]  Plaintiffs also point to testimony that Michelle Booker had at least two occasions on which she missed lunch, but was not paid.  For purposes of the "discrete instances" of the Court's analysis, this evidence is irrelevant as Booker is not a party to this action.

reporting system, whereby employees who believed they had not received an uninterrupted thirty

minute meal period could claim compensation for that time. *See* Def.'s Br. at 26-29.  Plaintiffs

admit they were aware of Mercy's expectation that they report missed time to either obtain relief

or compensation.  *See* Def.'s App. at 10 (Aiken testifying that he was aware he was supposed to

report interrupted meal periods), 23 (Haviland reporting the same), 37 (Patchin reporting the

same).  Evidence reveals that Plaintiffs Haviland and Aiken did, in fact, report occasions when

they believed they had been deprived of an uninterrupted meal period and were compensated for

that time.  *See id.* at 10 (Aiken testifying that he reported interrupted meal breaks "on a number

of occasions" and got paid); Pls.' App. at 179 (email from Haviland claiming he did not get a

meal break on October 5, 2007); Def.'s App. at 815, 857 (documents showing Haviland was paid

overtime compensation for October 5, 2007); Def.'s App. at 816, 842, 852-54, 857

(documentation showing that Haviland was paid for missed meal breaks on June 12, 2006, May

4, 2007, May 19, 2007, May 22, 2007, June 4, 2007, July 5, 2007, and July 13, 2007).

Numerous courts have held that an individual is estopped from claiming overtime compensation

when he violates an employer's reporting policy and, by so doing, precludes the employer's

opportunity to verify and pay, or refute the claim.  *See*, *e.g.*, *Allen v. Bd. of Pub. Educ. for Bibb

County*, 495 F.3d 13060, 1319 (11th Cir. 2007) ("There is no violation of the FLSA where the

employee performs uncompensated work but deliberately prevents his or her employer from

learning of it."); *Forrester*, 646 F.2d at 414-15 ("An employer must have an opportunity to

comply with the provisions of the FLSA.  This is not to say that an employer may escape

responsibility by negligently maintaining records required by the FLSA, or by deliberately

turning its back on a situation.  However, where the acts of an employee prevent an employer

from acquiring knowledge, here of alleged uncompensated overtime hours, the employer cannot

be said to have suffered or permitted the employee to work in violation of § 207(a)."); *Newton v.*

*City of Henderson*, 47 F.3d 746 (5th Cir. 1995) (finding it was reasonable for an employer to rely

on employee's time sheets for payroll purposes where there was no evidence the employer

encouraged workers to falsely report their hours); *Brumbelow v. Quality Mills, Inc*., 462 F.2d

1324, 1327 (5th Cir. 1972) (employee estopped from claiming that she had worked more hours

than the hours she claimed on her time sheets where the employer did not know and had no

reason to know that the information was inaccurate).

Plaintiffs make additional arguments that their failure to use Defendant's missed meal

reporting system to claim overtime compensation should not be deemed a waiver of their rights

to now claim overtime compensation.  First, Plaintiffs contend that "employees cannot waive

their wages or overtime wages."  Pls.' Br. at 31.  Plaintiffs are correct that waiver cannot be had

if there is sufficient evidence to generate a jury question as to whether the employer knew or had

reason to know that employees were working through unpaid meal periods.  *See Forrester*, 646

F.2d at 414 (stating that an employer who is "armed with knowledge that an employee is

working overtime cannot stand idly by and allow an employee to perform overtime work without

proper compensation, even if the employee does not make a claim");  *Allen*, 495 F.3d at 1319

("When an employer's actions squelch truthful reports of overtime worked, or where the

employer encourages artificially low reporting, it cannot disclaim knowledge.").  Thus, had the

Court found a factual question as to whether Mercy PSOs were inherently spending their lunch

hours working for Mercy's predominant benefit, Mercy would have no claim to waiver.  In a

case such as this one, however, where Plaintiffs are claiming years after the fact that on discrete

occasions they were not properly compensated for working through their meal periods, the

waiver or estoppel theory is applicable.  Indeed, by failing to report missed lunches at or near the

time of their occurrence, Plaintiffs have put Mercy in a position where it had neither an

opportunity to pay the claims or to refute them.

In considering Mercy's Motion for Summary Judgment, this Court is tasked with

"determining whether there is the need for a trial–whether, in other words, there are any genuine

factual issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party." *Anderson*, 477 U.S. at 250.  "[I]n every case, before the

evidence is left to the jury, there is a preliminary question for the judge, not whether there is

literally no evidence, but whether there is any upon which a jury could properly proceed to find a

verdict for the party producing it, upon whom the onus of proof is imposed." *Id*. at 251 (citations

omitted).  According to these standards, the Court finds that Plaintiffs have failed to show that

there are any genuine issues of fact that would preclude summary judgment in favor of

Defendant concerning the discrete instances of uncompensated interrupted meal periods.

### D.  *Plaintiffs' Iowa Law Claims*

Plaintiffs finally claim that Defendant's Motion for Summary Judgment fails to address

their parallel claims under Iowa Code Chapter 91A.  Pls.' Br. at 35-36.  However, as Defendant

aptly points out, its Motion specifically "seeks summary judgment on *all claims* against it."

Def.'s Reply at 25 (citing Mot. for Summ. J.).  The phrase "all claims" certainly encompasses

Plaintiffs' IWPCA claims.  Moreover, since the Iowa statute is sufficiently similar to the FLSA,

the same fatal defects that undermine Plaintiffs' FLSA claims also undermine their state law

claims.  *See Salazar v. Agriprocessors, Inc.*, 527 F. Supp. 2d 873, 880 (N.D. Iowa 2007) ("The

FLSA and the IWPC[A] are parallel federal and state laws."); *Anthony v. State*, 632 N.W.2d 897, 901 (Iowa 2001) ("Although the impetus for state wage policy involving FLSA overtime pay is the mandate of the federal legislation, the State has acceded to that mandate in a manner that establishes the resulting overtime remuneration as compensation owed by an employer."). Accordingly, the Court finds summary judgment in favor of Defendant proper on Plaintiffs' IWPCA claims for the same reasons it determined summary judgment proper in favor of Defendant proper on Plaintiffs' FLSA claims.

V.  CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Clerk's No. 90) is GRANTED with respect to all Counts of Plaintiffs' Amended Complaint.

IT IS SO ORDERED.

Dated this ___6th___ day of August, 2010.

ROBERT W. PRATT, Chief Judge
U.S. DISTRICT COURT